# No. 24-2696

# In the
# United States Court of Appeals
## for the Seventh Circuit

---

EAST GATE-LOGISTICS PARK CHICAGO, LLC and
NORTHPOINT DEVELOPMENT, LLC,

*Plaintiffs-Appellants,*

v.

CENTERPOINT PROPERTIES TRUST, CENTERPOINT JOLIET TERMINAL
RAILROAD, LLC and HOUBOLT ROAD EXTENSION JV, LLC,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:24-cv-03742.
The Honorable LaShonda A. Hunt, Judge Presiding.

## BRIEF AND APPENDIX OF PLAINTIFFS-APPELLANTS
## EAST GATE LOGISTICS PARK CHICAGO, LLC and
## NORTHPOINT DEVELOPMENT, LLC

ROBERT J. PALMERSHEIM (6237829)
TIMOTHY G. PARILLA (6324461)
HONIGMAN LLP
155 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
(312) 701-9300

*Counsel for Appellants*

 

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2696

Short Caption: East Gate Logistics Park Chicago, LLC et al v. CenterPoint Properties Trust et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

East Gate Logistics Park Chicago, LLC, NorthPoint Development, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Honigman LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      See attached

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Robert J. Palmersheim     Date: 9/26/2024

Attorney's Printed Name: Robert J. Palmersheim

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]   No [ ]

Address: Honigman LLP

155 N Wacker Dr Ste 3100, Chicago, IL 60606

Phone Number: (312) 701-9393     Fax Number: (312) 701-9335

E-Mail Address: rpalmersheim@honigman.com

rev. 12/19 AK

**RULE 26.1 DISCLOSURE STATEMENT FOR PLAINTIFFS-APPELLANTS
EAST GATE-LOGISTICS PARK CHICAGO, LLC AND NORTHPOINT
DEVELOPMENT, LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC ("NorthPoint"), disclose as follows:

East Gate is a limited liability company whose members are NP East Gate, LLC, Abrams Capital Partners I, L.P., Abrams Capital Partners II, L.P., and Riva Capital Partners IV, L.P. It is not a subsidiary nor parent of any publicly owned corporation, and no publicly owned corporation has substantial financial interest in the outcome of this litigation.

NorthPoint is a limited liability company whose member is NorthPoint Holdings, LLC. It is not a subsidiary nor parent of any publicly owned corporation, and no publicly owned corporation has substantial financial interest in the outcome of this litigation.

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2696

Short Caption: East Gate Logistics Park Chicago, LLC et al v. CenterPoint Properties Trust et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        East Gate Logistics Park Chicago, LLC, NorthPoint Development, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        Honigman LLP

(3)     If the party, amicus or intervenor is a corporation:

        i)      Identify all its parent corporations, if any; and

                See attached

        ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: /s/ Timothy G. Parilla          Date: 9/27/2024

Attorney's Printed Name:  Timothy G. Parilla

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [ ]     No [✔]

Address:  155 N Wacker Dr Ste 3100, Chicago, IL 60606

Phone Number:  (312) 429-6026          Fax Number:  (312) 701-9335

E-Mail Address: tparilla@honigman.com

rev. 12/19 AK

**RULE 26.1 DISCLOSURE STATEMENT FOR PLAINTIFFS-APPELLANTS EAST GATE-LOGISTICS PARK CHICAGO, LLC AND NORTHPOINT DEVELOPMENT, LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC ("NorthPoint"), disclose as follows:

East Gate is a limited liability company whose members are NP East Gate, LLC, Abrams Capital Partners I, L.P., Abrams Capital Partners II, L.P., and Riva Capital Partners IV, L.P. It is not a subsidiary nor parent of any publicly owned corporation, and no publicly owned corporation has substantial financial interest in the outcome of this litigation.

NorthPoint is a limited liability company whose member is NorthPoint Holdings, LLC. It is not a subsidiary nor parent of any publicly owned corporation, and no publicly owned corporation has substantial financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................v

TABLE OF AUTHORITIES ............................................................................... vii

JURISDICTIONAL STATEMENT ...................................................................1

INTRODUCTION ................................................................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................6

STATEMENT OF CASE ....................................................................................6

I.     CenterPoint's Monopoly of the Joliet Intermodal Zone's Commercial
       Warehouse Market .................................................................................6

II.    The Memorandum of Understanding.......................................................7

III.   The Third Coast Development's Truck-Accessible Connection to the
       Joliet Intermodal Zone and the Construction of Its First Warehouses..............8

IV.    The Will County Lawsuit and TRO Enjoining The City's Approval of
       East Gate and NorthPoint's Use of the Temporary Connection ..........................9

V.     The Escalating Harm and Imminent Threat to NorthPoint and East
       Gate........................................................................................................10

VI.    Procedural History ...............................................................................11

       SUMMARY OF THE ARGUMENT.................................................................13

       ARGUMENT.....................................................................................................15

I.     Standard of Review ...............................................................................15

II.    The District Court Improperly Abstained Under *Colorado River* Given
       this Circuit's Decisions in *Medema* and *Adkins* and The Presence of
       Exclusively Federal Sherman Act Claim. ..............................................16

III.   The District Court Erred in Finding that the Federal Case was Parallel
       to the Will County Lawsuit. ..................................................................20

       A.     The concurrent actions do not involve substantially the same
              parties. ........................................................................................20

B. The concurrent actions do not involve substantially the same issues. ...................................................................................................22

IV. The District Court Abused Its Discretion When It Concluded that Exceptional Circumstances Warranted a Stay. ......................................25

CONCLUSION ...............................................................................................35

CERTIFICATE OF COMPLIANCE ...............................................................1

CIRCUIT RULE 30(D) STATEMENT .............................................................2

CERTIFICATE OF SERVICE ..........................................................................3

# TABLE OF AUTHORITIES

CASES ................................................................................ PAGE(S)

*Adkins v. VIM Recycling, Inc.,*
644 F.3d 483 (7th Cir. 2011) ..................... 5, 11, 12, 14-16, 18-20, 22, 25, 26, 31

*Antosh v. Vill. of Mount Pleasant,*
99 F.4th 989 (7th Cir. 2024) .................................................................... 22

*Baek v. Clausen,*
886 F.3d 652 (7th Cir. 2018) .................................................................... 33

*Bates v. Laminack,*
938 F. Supp. 2d 649 (S.D. Tex. 2013) ...................................................... 29

*Clark v. Lacy,*
376 F.3d 682 (7th Cir. 2004) .................................................................... 20

*Colorado River Water Conservation Dist. v. United States,*
424 U.S. 800 (1976) ................................................................................. 13

*Cottrell v. Duke,*
737 F.3d 1238 (8th Cir. 2013) ............................................................ 16, 17

*Driftless Area Land Conservancy v. Valcq,*
16 F.4th 508 (7th Cir. 2021) .................................................................... 33

*First Federal S L Ass'n v. Faubion,*
475 N.E.2d 989 (Ill. App. 1985) .............................................................. 31

*Frantzve v. Joseph,*
502 N.E.2d 396 (Ill. App. 1986) .............................................................. 17

*Freed v. J.P. Morgan Chase Bank, N.A.,*
756 F.3d 1013 (7th Cir. 2014) ...................................................... 16, 20, 33

*GeLab Cosms. LLC v. Zhuhai Aobo Cosms. Co.,*
99 F.4th 424 (7th Cir. 2024) ........................................ 16, 20, 21, 24, 25

*Grdinich v. Plan Comm'n for Town of Hebron Indiana,*
No. 2:18-CV-146-JVB-JEM, 2020 WL 3868704 (N.D. Ind. July 9, 2020) ..................................................................................................... 33

*Hennessy Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
770 F.3d 676 (7th Cir. 2014) .................................................................... 17

*Houbolt Road Extension JV, LLC v. City of Joliet,*
   Case No. 2022MR000138 (Will Cty. Cir. Ct.) .......................................................... 4

*Huon v. Johnson & Bell, Ltd.,*
   657 F.3d 641 (7th Cir. 2011) ......................................................................... 22, 32

*Illinois Bell Tel. Co. v. Illinois Com. Comm'n,*
   740 F.2d 566 (7th Cir. 1984) ................................................................................ 30

*Johns v. Paycor, Inc.,*
   No. 3:20-CV-264-DWD, 2024 WL 2049737 (S.D. Ill. May 8, 2024) ..................... 29

*Kupferberg, Goldberg & Niemark, LLC. v. Father & Son Pizza, Ltd.,*
   No. 95 C 3690, 1996 WL 111900 (N.D. Ill. 1996) ........................................... 18, 19

*Loughran v. Wells Fargo Bank, N.A.,*
   2 F.4th 640 (7th Cir. 2021).................................................................... 20, 22, 27

*Marrese v. Am. Acad. of Orthopaedic Surgeons,*
   726 F.2d 1150 (7th Cir. 1984) ............................................................................... 31

*Medema v. Medema Builders, Inc.,*
   854 F.2d 210 (7th Cir. 1988) .......................................................... 5, 11, 12, 14-19, 25

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) ................................................................. 2, 14, 26, 28, 29

*Pelfresne v. Stephens,*
   35 F. Supp. 2d 1064.............................................................................................. 31

*Prop. & Cas. Ins. Ltd. v. Cent. Nat. Ins. Co. of Omaha,*
   936 F.2d 319 (7th Cir. 1991) ................................................................................ 15

*Quackenbush v. Allstate Ins. Co.,*
   517 U.S. 706 (1996) ............................................................................................... 2

*R. C. Wegman Construction Co. v. Admiral Ins. Co.,*
   687 F.3d 362 (7th Cir. 2012) ................................................................................. 2

*Ring v. Deming II, LLC,*
   2015 IL App (1st) 131731-U ................................................................................. 21

*Ryan v. Johnson,*
   115 F.3d 193 (3d Cir. 1997)................................................................................... 28

*Sports Rehab Consulting LLC v. Vail Clinic, Inc,*
   No. 19-CV-2075-WJM-GPG, 2020 WL 4926114 (D. Colo. 2020) .......................... 18

*Sverdrup Corp. v. Edwardsville Cmty. Unit Sch. Dist. No. 7*,
125 F.3d 546 (7th Cir.1997) .................................................. 30

*Truserv Corp. v. Flegles, Inc.*,
419 F.3d 584 (7th Cir. 2005) ........................................ 24, 25

*Trustees of Chicago Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.*,
2023 WL 22141 (N.D. Ill. 2023) ........................................ 18

*Tyrer v. City of S. Beloit, Ill.*,
456 F.3d 744 (7th Cir. 2006) ............................................. 29

*United States v. Julius*,
14 F.4th 752 (7th Cir. 2021) ............................................. 27

*Wabash Pub. Co. v. Flanagan*,
No. 89 C 1923, 1990 WL 19977 (N.D. Ill. Feb. 27, 1990) ..................... 31

*Yeomans Chicago Corp. v. Goulds Pumps, Inc.*,
No. 12 C 6822, 2013 WL 655519 (N.D. Ill. Feb. 21, 2013) ................... 26

## STATUTES

15 U.S.C. §§ 1-2............................................................. 17

28 U.S.C § 1291............................................................. 2

28 U.S.C. §§ 1331............................................................ 1

28 U.S.C. §§ 1337............................................................ 1

28 U.S.C. § 1367(a) ........................................................ 1

28 U.S.C. § 1391............................................................ 1

740 ILCS 10/7(2) .......................................................... 30

# JURISDICTIONAL STATEMENT

As Plaintiffs-Appellants East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC's ("NorthPoint") complaint contained federal Sherman Act claims, the United States District Court for the Northern District of Illinois has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. It also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

The district court has personal jurisdiction over Defendants-Appellees CenterPoint Properties Trust, CenterPoint Joliet Terminal Railroad, LLC, (collectively "CenterPoint") and Houbolt Road Extension JV, LLC ("HRE"). Personal jurisdiction exists because CenterPoint Joliet Terminal Railroad, LLC is organized under the laws of Illinois with its principal place of business in Oak Brook, Illinois, and CenterPoint Properties Trust and Houbolt Road Extension JV, LLC have sufficient minimum contacts with the Northern District of Illinois as a result of intentional contacts with this District and CenterPoint and HRE's illegal acts that have and continue to inflict injury on East Gate and NorthPoint in this District.

Venue is proper in the district court pursuant to 28 U.S.C. § 1391, and the district court may properly exercise personal jurisdiction over CenterPoint and HRE since CenterPoint and HRE directly targeted their anticompetitive activities against East Gate and NorthPoint's operations in Illinois and wrongfully caused injury to East

Gate and NorthPoint and competition in the commercial warehouse market in the Joliet Intermodal Zone in and around Joliet, Illinois.

The Seventh Circuit has jurisdiction over this appeal. A district court's stay of court proceedings is an interlocutory order and therefore normally not appealable. But there are exceptions, such as the district court's abstention under *Colorado River,* an abdication of federal jurisdiction in favor of a state court in which another suit is pending. *R. C. Wegman Construction Co. v. Admiral Ins. Co.,* 687 F.3d 362, 364 (7th Cir. 2012).

The District Court granted CenterPoint and HRE's motion to stay the proceedings on September 23, 2023 under the *Colorado River* doctrine because the District Court found that the instant federal lawsuit was parallel with another lawsuit pending in the Circuit Court of Will County, Illinois. Dkt. Nos. 89-90. Appellants timely filed its Notice of Appeal on September 24, 2024. An abstention-based stay order is appealable because it "falls within that narrow class of collateral orders that are immediately appealable" under 28 U.S.C § 1291. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712 (1996); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 2 (1983).

Thus, the Seventh Circuit has jurisdiction over this appeal.

**INTRODUCTION**

This is an appeal of the district court's erroneous decision to stay this case based on the *Colorado River* doctrine. This is a dispute between the largest commercial warehouse developers in the area surrounding two intermodal facilities in Joliet, Illinois (the "Joliet Intermodal Zone"). East Gate and NorthPoint seek to increase competition by introducing a new warehouse development within the Joliet Intermodal Zone (the "Third Coast Development"). However, HRE and CenterPoint are colluding to prevent the Third Coast Development's viability and to solidify CenterPoint's warehouse monopoly for decades to come. Due to this anticompetitive conduct, East Gate and NorthPoint sued CenterPoint and HRE under the Sherman Act. East Gate and NorthPoint now bring this appeal because the district court improperly refused its obligation to exercise federal jurisdiction over exclusively federal antitrust claims. The district court also abused its discretion by granting the stay where (1) the concurrent state and federal cases were not parallel and (2) exceptional circumstances did not warrant a stay.

After learning of its competitors' Third Coast Development plans, CenterPoint executed a contract that it would later wield against East Gate and NorthPoint to block physical access to the Third Coast Development. Under this agreement—a Memorandum of Understanding ("MOU") among CenterPoint (later assigned to HRE), the City of Joliet ("City"), the Will County Division of Transportation, and the Illinois Department of Transportation—CenterPoint agreed to finance a toll bridge over the Des Plaines River (the "Houbolt Road Toll Bridge"). CenterPoint and HRE argue that, by

signing the MOU, the City relinquished its authority to regulate or modify weight restrictions on roads within the Joliet Intermodal Zone. Ostensibly to ensure toll revenue for the Houbolt Road Toll Bridge, CenterPoint also gained power to veto competitors' developments in the Joliet Intermodal Zone for decades through the MOU.

The City disputed this interpretation and approved the Third Coast Development. Over HRE and CenterPoint's objection, the City agreed to connect the Third Coast Development's warehouses to truck accessible roadways by eliminating weight restrictions on a 1,000-foot strip of Millsdale Road (the "Temporary Connection"). The Temporary Connection is the sole truck-accessible connection into or out of the Third Coast Development for prospective tenants. Without it, East Gate and NorthPoint cannot compete with CenterPoint for customers. But after the City granted the Temporary Connection, HRE promptly sued the City alleging it breached the MOU.[1] HRE ultimately secured a temporary restraining order on March 19, 2024 ("TRO") effectively preventing truck access to the Third Coast Development.

On May 8, 2024, East Gate and NorthPoint sued CenterPoint and HRE and shortly thereafter moved for a preliminary injunction to invalidate MOU Section XII.B(3).[2] In response, CenterPoint and HRE filed a litany of motions, including a

---

[1] *Houbolt Road Extension JV, LLC v. City of Joliet,* Case No. 2022MR000138 (Will Cty. Cir. Ct.) (the "Will County Lawsuit").

[2] East Gate and NorthPoint's motion for preliminary injunction is supported by seven declarations, including numerous expert declarations.

motion to stay based on the *Colorado River* abstention doctrine. On September 23, 2024, the district court improperly granted the stay ("Stay Order").

This Court should reverse the Stay Order because it suffers from multiple, independent legal errors. To start, this Court's decisions in *Medema v. Medema Builders, Inc.*, 854 F.2d 210, 212-13 (7th Cir. 1988) and *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 500 (7th Cir. 2011) preclude application of *Colorado River* to this case. Under *Medema* and *Adkins*, abstention is "not appropriate" whenever plaintiffs bring claims invoking the exclusive jurisdiction of federal courts. Yet, the district court ignored this controlling precedent by staying this action despite East Gate and NorthPoint's exclusively federal Sherman Act claims.

The district court also erred in granting a stay because this case is not "parallel" to the Will County Lawsuit, as required under *Colorado River*. *Adkins,* 644 F.3d at 498 ("suits are parallel for *Colorado River* purposes" when, unlike here, "substantially the same parties are contemporaneously litigating substantially the same issues"). According to relevant law and the district court's own findings in the Stay Order, these concurrent actions are not "substantially the same." *Id*. at 499.

Finally, the district court abused its discretion in concluding that "exceptional circumstances" warranted abstention, while misapplying the facts and law as to multiple factors.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the district court err when it granted CenterPoint and HRE's motion to stay under *Colorado River* despite the presence of multiple Sherman Act claims, which invoke exclusive federal jurisdiction?

2. Did the district court err when it found party parallelism existed under *Colorado River*, despite the fact neither East Gate nor NorthPoint were parties to the concurrent state court proceeding?

3. Did the district court err when it found issue parallelism necessary for *Colorado River* abstention, even though all parties agreed that the Will County Lawsuit would not resolve all East Gate and NorthPoint's claims?

4. Did the district court abuse its discretion when it found that "exceptional circumstances" warranted a stay?

## STATEMENT OF CASE

I. CenterPoint's Monopoly of the Joliet Intermodal Zone's Commercial Warehouse Market

Industrial parks adjacent to intermodal facilities contain warehouses that shippers use for storage and distribution. R-25, p. 14. Shippers with warehouse space at such parks use heavyweight trucks to transport containers from the intermodal facility to a warehouse, where the containers are unpacked and then returned to the intermodal facility empty. *Id*. At the warehouse, goods are re-packaged and loaded onto trucks for distribution. *Id*. One of the most influential factors for warehouse placement is intermodal terminal proximity, which reduces short-term transportation costs between the intermodal facility and warehouse and promotes efficiency. *Id*.

CenterPoint owns the largest commercial warehouse development in the Joliet Intermodal Zone. *Id*. at p. 12. It also owns the most available land adjacent to the intermodal railyards and the most warehouses in the market. *Id*. As alleged, Center-Point's market share in the Joliet Intermodal Zone is approximately 80 percent, and they are poised to control up to 100 percent in the near future. R-1, p. 37; R-25, p. 22 and 22 n.3. CenterPoint's market position in the Joliet Intermodal Zone is also protected by high barriers to entry. *Id*. at p. 13.

II.  The Memorandum of Understanding

After East Gate and NorthPoint began acquiring land in the Joliet Intermodal Zone, CenterPoint executed the MOU in late 2016. *Id*. *See also* A24-40. CenterPoint later assigned its rights under the MOU to HRE. R-25, p. 16. The MOU's stated purpose is to facilitate CenterPoint's financing and construction of the Houbolt Road Toll Bridge and, in exchange, it was permitted to "impose toll rates" that would be set by a future bridge and ground lease agreement. *Id*. *See also* A30.

However, HRE and CenterPoint used another provision of the MOU to hinder the City's ability to regulate traffic on local roads. Specifically, the MOU provides, in relevant part: "The CITY and COUNTY agree that they will take no steps or actions to . . . (3) *eliminate trucking restrictions, weight limits, or other similar regulations on roads* that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center." A32 (emphasis added). The MOU defines "adjacent to the CNT Intermodal Center" as the "Study Area," which encompasses much of the Joliet Intermodal Zone. A33, A40 (map showing the extent of "Study Area").

III. The Third Coast Development's Truck-Accessible Connection to the Joliet Intermodal Zone and the Construction of Its First Warehouses.

East Gate and NorthPoint began work on the Third Coast Development in 2013 with the eventual goal of building tens of millions of square feet of warehouse space in direct competition with CenterPoint's warehouses. *Id.* at p. 15.

On December 21, 2021, with City Council approval, East Gate and the City entered into an Amended and Restated Annexation and Development Agreement ("East Gate Annexation Agreement"). *Id.* at p. 16. When the parties executed the East Gate Annexation Agreement, the only entry and exit point for the Third Coast Development was through the Temporary Connection, which is located approximately 1,000 feet from the road currently allowed for truck traffic. *Id.* at pp. 16-17. Allowing trucks to use the Temporary Connection supports the goals of the MOU by requiring additional trucks to use the Houbolt Road Toll Bridge, increasing the financial viability of the Houbolt Road Toll Bridge, streamlining truck traffic in the Joliet Intermodal Zone, and improving traffic safety. *Id.* at p. 17. *See also* A24.

Following the East Gate Annexation Agreement's approval, East Gate and North-Point began construction of the first three warehouses of the Third Coast Development. R-25, p. 17. Believing that their customers would have access via the Temporary Connection, East Gate and NorthPoint invested hundreds of millions of dollars to cover costs for these warehouses. *Id.* They also invested tens of millions of dollars on infrastructure, including for a "Closed Loop Truck Network" that allows heavy weight trucks to carry full shipping containers between the nearby intermodal terminals and the Third Coast Development. *Id.* NorthPoint and East Gate plan to

develop an additional thirty-five to forty million square feet of warehouse space based on projected customer demand in the Joliet Intermodal Zone. *Id.*

### IV. The Will County Lawsuit and TRO Enjoining The City's Approval of East Gate and NorthPoint's Use of the Temporary Connection

On May 9, 2022, HRE filed a complaint alleging the City breached the MOU and filed an emergency motion for a temporary restraining order, seeking to bar the City from allowing East Gate and NorthPoint's use of the Temporary Connection: the sole truck-accessible connection to the Third Coast Development.[3] *Id.* at pp. 17-18. In its motion, HRE argued that the Temporary Connection and other infrastructure improvements "would allow truck traffic to avoid the tolls on the [Houbolt Road Toll Bridge] and thus . . . undermine HRE's rights under the MOU." *Id.* at p. 18. In response, the City demonstrated the Third Coast Development, including the Closed Loop Truck Network, would actually *promote* truck traffic using the Houbolt Road Toll Bridge. *Id.*

After the Will County Court denied HRE's 2022 request for a temporary restraining order, the City moved to dismiss HRE's complaint, which the Will County Court granted. *Id.* On appeal, the appellate court largely affirmed the Will County Court's

---

[3] In June 2024, the Illinois Department of Transportation approved a temporary truck connection onto Route 53 for one Third Coast Development tenant in its current occupancy based on certain conditions. R-25, pp. 19. This means the other Third Coast Development tenant and any other potential tenants have no assurance that they have truck access to the Third Coast Development. *Id.*

dismissal of HRE's claims except it remanded the lawsuit finding that, at the motion to dismiss stage, HRE adequately pled a claim for breach of contract. Specifically, it found HRE stated a claim under section XII.B.3 of the MOU, which provides that the City will not take steps or actions to "eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the [CenterPoint] Intermodal Center or on roads that are adjacent to the [CenterPoint] Intermodal Center." *Id.* at pp. 18-19.

Upon remand, HRE renewed its request for a TRO, again complaining about the potential effects of the Third Coast Development on its "ability to collect toll revenue." *Id.* at p. 19. In response, the City again argued the Third Coast Development will "increase HRE's toll revenue." *Id.* But on March 20, 2024, the Court granted HRE's request for a TRO enjoining the City from temporarily permitting trucks to use the Temporary Connection. *Id. See also* A19-23. The TRO in the Will County Lawsuit will remain in effect until at least mid-2025, which is too late to prevent further irreparable harm to East Gate and NorthPoint. R-64, p. 18.

V. The Escalating Harm and Imminent Threat to NorthPoint and East Gate

HRE and CenterPoint's actions to block truck access to the Third Coast Development have deprived East Gate and NorthPoint of their ability to make productive use of the development and threatens to irrevocably damage their businesses, including their reputation with customers and financiers. R-25, p. 20. CenterPoint and HRE's concerted efforts will soon succeed in driving East Gate and NorthPoint out of the Joliet Intermodal Zone and will prevent East Gate and NorthPoint from keeping existing tenants and attracting new tenants to the Third Coast Development. *Id.*

If unable to obtain truck access to the Third Coast Development, East Gate and NorthPoint's lenders will pull their financing, forcing East Gate into insolvency and requiring NorthPoint to liquidate existing real estate holdings. *Id*. at pp. 20-21. CenterPoint and HRE's actions have also stalled the balance of the Third Coast Development (approximately 35-40 million square feet of commercial warehouse space) as no further development can occur within the Third Coast Development without truck access. *Id*. at p. 21.

Defaulting on financing obligations would also significantly damage NorthPoint's reputation and goodwill among its lender base, making it more difficult to raise capital for further projects and increasing the cost for NorthPoint to compete with other developers on other projects. *Id*. CenterPoint and HRE's conduct is also adversely affecting consumers of warehouse services in the Joliet Intermodal zone, and the public. *Id*. at pp. 22-23.

## VI. Procedural History

On May 8, 2024, East Gate and NorthPoint filed their Complaint, bringing Sherman Act claims that invoke exclusive federal jurisdiction. *See* R-1. Next, East Gate and NorthPoint filed a motion for preliminary injunction, seeking to enjoin enforcement of Section XII.B.3 of the MOU under the Sherman Act. *See generally* R-23, R-25. Shortly thereafter, CenterPoint and HRE filed a motion to stay under *Colorado River* and two motions to dismiss. *See* R-48, R-50, and R-61. The parties briefed the three motions on an expedited basis. *See* R-58, R-64-R-69, R-71-R-87. East Gate and NorthPoint challenged the applicability of *Colorado River* based on (1) this Court's decisions in *Medema* and *Adkins* (R-64, pp. 6, 8-10); (2) the fact that the issues and

parties were not "parallel" (*Id*. pp. 10-18); and (3) the absence of "exceptional circumstances" to justify a stay. (*Id*. pp. 18-20).

The district court held a hearing on CenterPoint and HRE's three motions on August 30, 2024. R-88. During that hearing, the district court did not ask the parties about *Colorado River*. Instead, the district court expressed doubt regarding its applicability here: "I also think that the factual scenario that has been presented does not fall very neatly into the . . . *Colorado River* analysis." A43:3-5.

On September 23, 2024, the district court denied CenterPoint and HRE's motions to dismiss for lack of subject matter jurisdiction and granted their motion to stay under *Colorado River*. A01-18 (staying the proceedings "until the state court [in the Will County Lawsuit] issues a final decision on the merits[.]"). The court also denied CenterPoint and HRE's Rule 12(b)(6) motion to dismiss, East Gate and NorthPoint's motions for expedited discovery, and East Gate and NorthPoint's motion for a preliminary injunction without prejudice. A17-18.

When conducting its *Colorado River* analysis, the district court failed to address the binding *Medema* and *Adkins* decisions. *See* A12-18. Instead, the district court began by analyzing "whether the state and federal court proceedings are actually parallel." A13. The district court noted that "the named parties in the [Will County Lawsuit] and this case are not the same." *Id*. However, the court still concluded that the concurrent actions "involved *substantially* the same parties" based on the parties' "nearly identical interests." *Id*. It reached that conclusion, in part, by finding that CenterPoint was "substantially the same" party as HRE, and the City was

"substantially the same" party as East Gate/NorthPoint, merely because each respective set of parties (and *nonparties*) wanted the same outcome in the Will County Lawsuit. A14.

When discussing whether the Will County Lawsuit and the federal antitrust claims were "predicated on the same facts" and "resolved by reference to the same evidence," the only overlap the district court noted between the cases was § XII.B(3) of the MOU. *Id.* The court also noted that some, but not all, of East Gate and NorthPoint's claims would be resolved by the Will County Lawsuit *if the City convinced the court in the Will County Lawsuit to reverse its findings that led to the entry of the TRO. Id.* The district court noted that, if HRE prevails, only one issue will be narrowed, and no claims will be resolved. *Id.*

After deciding that these concurrent actions were parallel, the district court concluded that "exceptional circumstances" warranted a stay, finding that eight of ten relevant factors favored abstention. *Id.* at A15-17.

## SUMMARY OF THE ARGUMENT

The district court's decision to abstain under *Colorado River* was error and should be reversed because East Gate and NorthPoint's Sherman Act claims invoke exclusive federal jurisdiction. *Colorado River* abstention allows federal courts to defer to a concurrent state proceeding as a matter of "wise judicial administration" in certain limited circumstances. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). In creating *Colorado River* abstention, the Supreme Court warned that the circumstances permitting the stay of a federal suit due to the

presence of a concurrent state proceeding are considerably more limited than the circumstances appropriate for other forms of abstention. *Id*. Additionally, when a federal court is asked to abstain in favor of a parallel lawsuit pending in another court, the presumption is against abstention. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25-26.

Because the mere existence of concurrent state and federal litigation is not sufficient to invoke *Colorado River* abstention, two factors must be present before a federal court abstains. First, the concurrent state and federal court proceedings must be parallel. Second, even if the proceedings are parallel, exceptional circumstances must exist to justify abstention.

In *Medema*, this Court created a brightline rule that *Colorado River* stays are not appropriate in cases involving nonfrivolous claims that invoke the exclusive jurisdiction of the federal courts. 854 F.2d at 215. *Adkins*, 644 F.3d at 500 (following the precedent established in *Medema*). A strict limitation on the scope of *Colorado River* is consistent with the narrow nature of the doctrine and Congress's grant of exclusive federal jurisdiction. When exclusively federal claims are at play, abstention would run counter to Congress's determination, reflected in grants of exclusive federal jurisdiction, that federal courts should be the primary fora for handling such claims. The district court's failure to follow *Medema* warrants reversal.

The district court also erred by staying this case by incorrectly finding that: (1) party parallelism exists, despite acknowledging that neither East Gate nor North-Point are parties in the Will County Lawsuit; (2) issue parallelism exists, despite

CenterPoint and HRE's own admission that the Will County Lawsuit *cannot* resolve all of the claims asserted; and (3) finding exceptional circumstances warranted a stay.

## ARGUMENT

This Court should reverse the district court's Stay Order because the district court erred in abstaining under *Colorado River* for four reasons. First, the district court ignored this Circuit's *Medema* and *Adkins* decisions. *Medema,* 854 F.2d at 213-214; *Adkins*, 644 F.3d at 500. Second, East Gate and NorthPoint's claims are not parallel because neither federal plaintiff is a party to the Will County Lawsuit – and because the City is not (and could not) fully representing their interests or their claims. Third, East Gate and NorthPoint's claims are not parallel because, as CenterPoint and HRE conceded, the Will County Lawsuit cannot dispose of all the claims brought in their federal suit. Fourth, the district court abused its discretion by misapplying the relevant factors to find that exceptional circumstances warranted a stay.

### I. Standard of Review

"In reviewing the district court's decision to abstain, the underlying legal questions are subject to *de novo* review" and "the decision itself is reviewed for abuse of discretion." *Prop. & Cas. Ins. Ltd. v. Cent. Nat. Ins. Co. of Omaha*, 936 F.2d 319, 321 (7th Cir. 1991); *Adkins*, 644 F.3d at 496. Although "the *Colorado River* determination is left to the discretion of the district court," this Court must reverse when "the judge exceed[s] the bounds of that discretion." *Medema*, 854 F.2d at 212. However, a district court has "little or no discretion . . . to abstain in a case that does not meet traditional abstention requirements, and that determination is a question of law." *Prop. & Cas. Ins. Ltd.*, 936 F.2d at 321. That description fits this case because a "district court has

no discretion to stay proceedings as to claims within exclusive federal jurisdiction." *Medema*, 854 F.2d at 213 (7th Cir. 1988); *see also Adkins*, 644 F.3d at 496, 500.

*De novo* review applies to the district court's determination that concurrent state and federal actions are "parallel" for purposes of *Colorado River* abstention. *GeLab Cosms. LLC v. Zhuhai Aobo Cosms. Co.*, 99 F.4th 424, 428 (7th Cir. 2024); *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1019 (7th Cir. 2014) ("A district court determination that the state and federal court proceedings are parallel is reviewed by this court *de novo*."). "Any doubt regarding the parallel nature of the [state] suit should be resolved in favor of exercising jurisdiction." *Adkins*, 644 F.3d at 499.

Further, "[a] court may stay a federal case pending a parallel state proceeding only if abstention is justified by exceptional circumstances" based on application of "ten non-exhaustive factors." *GeLab Cosms.*, 99 F.4th at 430. "[T]he task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Adkins*, 644 F.3d at 500. The "exceptional circumstances factors" are "guideposts for the ultimate inquiry: Was a decision to abstain an abuse of discretion?" *GeLab Cosms. LLC*, 99 F.4th at 430.

II. The District Court Improperly Abstained Under *Colorado River* Given this Circuit's Decisions in *Medema* and *Adkins* and The Presence of Exclusively Federal Sherman Act Claims.

The district court erred in staying East Gate and NorthPoint's Sherman Act claims because it ignored "the consensus among circuits that *Colorado River* does not apply when an exclusively federal claim is properly before the district court." *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir. 2013) (citing *Medema,* 854 F.2d at 213-15).

Notably, absent from the district court's decision is any discussion of *Medema* despite the fact East Gate and NorthPoint discussed that decision at length in their response brief. *Compare* A01-18 *with* R-64, pp. 6, 8-10.

In *Medema,* the Seventh Circuit found that the district court erroneously "refused to give *conclusive* weight to the presence of" an exclusively federal Securities Exchange Act of 1934 claim when evaluating a motion for stay based on *Colorado River.* 854 F.2d at 213 (emphasis added). "Congress grants exclusive federal jurisdiction in order to cultivate uniformity and expertise, and sometimes to ensure the use of more liberal federal procedural protections" and all these purposes "are thwarted by deference to concurrent state proceedings." *Id.*

The *Medema* court reversed the district court's stay decision notwithstanding Illinois's "blue sky" laws, which would have allowed the plaintiff to pursue analogous securities fraud claims in Illinois state court. *See e.g., Frantzve v. Joseph,* 502 N.E.2d 396, 396-97 (1986) (discussing cause of action under the Illinois Securities Law of 1953). Likewise, here, East Gate and NorthPoint's exclusively Sherman Act claims should have prevented HRE and CenterPoint's motion to stay. 15 U.S.C. §§ 1-2; *Hennessy Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 770 F.3d 676, 679 (7th Cir. 2014) ("Antitrust claims arising under the Sherman Act . . . are within the exclusive jurisdiction of the federal courts").

Courts have continually relied on *Medema* for the brightline rule that they cannot abstain when exclusively federal claims are present, including based on the presence of Sherman Act claims. *See Cottrell,* 737 F.3d at 1246 (recognizing a "consensus

among circuits that *Colorado River* does not apply when an exclusively federal claim is properly before the district court."); *Trustees of Chicago Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.,* 2023 WL 22141 at *5 (N.D. Ill. 2023) (applying *Medema* based on presence of ERISA claims, explaining that "[i]n any event, the *Colorado River* abstention does not apply where Congress has established exclusive federal jurisdiction."); *Kupferberg, Goldberg & Niemark, LLC. v. Father & Son Pizza, Ltd.,* No. 95 C 3690, 1996 WL 111900, at *2 (N.D. Ill. 1996) (applying *Medema* based on presence of federal copyright claims); *Adkins,* 644 F.3d at 500 (applying *Medema* based on presence of federal environmental claims subject to exclusive federal jurisdiction and holding that "the district court's decision to abstain . . . stretched *Colorado River* abstention too far"). Indeed, the Court should "find deferral under Colorado River an abuse of discretion" because "there are Sherman Act claims pending in the Federal Court Action," while "*in the State Court Action there are no pending state antitrust claims*[.]" *Sports Rehab Consulting LLC v. Vail Clinic, Inc,* No. 19-CV-2075-WJM-GPG, 2020 WL 4926114, at *6 (D. Colo. 2020) (relying, in part, on *Medema* to reach this conclusion).

In *Adkins*, this Court reaffirmed its decision in *Medema*: "Our precedent holds that 'where a plaintiffs nonfrivolous claim invokes the exclusive jurisdiction of federal courts, the *Colorado River* stay is not appropriate.' " *Adkins*, 644 F.3d at 500 (quoting *Medema*, 854 F.2d at 215). In doing so, it reversed a district court's *Colorado River* stay of a plaintiffs' claim under the federal Resource Conservation and Recovery Act,

explaining that the presence of the claim "remove[d] the abstention options from the district court's toolbox."

In response to East Gate and NorthPoint's arguments based on *Medema* and *Adkins*, CenterPoint and HRE failed to cite any decisions from this Court narrowing the brightline rule set forth in *Medema* and reaffirmed in *Adkins*. R-71, pp. 7-11. That is, the district court had a "virtually unflagging obligation" to exercise its jurisdiction based on the presence of the exclusively federal Sherman Act claims. *Medema*, 854 F.2d at 212.

These decisions also confirm that abstention is improper regardless of whether the state and federal actions are "parallel" under the *Colorado River* doctrine. *Medema,* 854 F.2d at 213 (even though the concurrent actions were "indeed parallel," the presence of exclusively federal claims still prevented a stay); *Adkins,* 644 F.3d at 500 (finding that the district court abused its discretion by granting a *Colorado River* stay, even though the concurrent actions involved parallel parties and "generally deal[t] with" the same set of facts and issues); *Kupferberg,* 1996 WL 111900, at *2 ("Although the actions here may be parallel, the federal action falls within the class of cases that involve an exclusively federal question, and therefore this court cannot grant . . . a stay."). Under *Medema,* even if East Gate and NorthPoint's federal claims *were* parallel to HRE's breach of contract claims in the Will County Lawsuit (which they are *not),* the Court still could not grant a *Colorado River* stay.

As such, the District Court's Stay Order was in error and reversal is warranted.

III.  The District Court Erred in Finding that the Federal Case was Parallel to the Will County Lawsuit.

The district court also erred in finding the Will County Lawsuit was parallel with this federal lawsuit. It did so because the parties in these concurrent proceedings are not substantially the same and the issues are not substantially the same. *Adkins,* 644 F.3d at 498 ("Two suits are parallel for *Colorado River* purposes" when, unlike here, "substantially the same parties are contemporaneously litigating substantially the same issues.").

A.  The concurrent actions do not involve substantially the same parties.

The district court erroneously found party parallelism for *Colorado River* purposes where it solely relied on the City and East Gate and NorthPoint's alignment in litigating cases where they seek to protect the Third Coast Development's truck access. A13-14. However, that analysis does not square with this Court's precedent, which assesses party parallelism by evaluating the "overall similarity of the disputes." *Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 648 (7th Cir. 2021). This inquiry is intended to prevent parties from destroying party parallelism "by simply tacking on a few more defendants," *Clark v. Lacy*, 376 F.3d 682, 686–87 (7th Cir. 2004), or by removing key parties for "no legitimate reason." *Freed*, 756 F.3d at 1020.

After acknowledging that the parties in the concurrent proceedings were not identical, the district court relied on *GeLab*'s "nearly identical interest" language to find they were "substantially the same." A13. However, that conclusion was misplaced because the plaintiffs in the concurrent proceedings in *Gelab* were effectively the same party, asserting rights against the same defendants, and arising out of the same

transactions. *GeLab Cosmetics LLC*, 99 F.4th at 429 ("Chen wants the New Jersey court to find that he owns a majority of GeLab and that Zhuhai owns none of it—the same thing he hopes to show in federal court in order to prevail on his trade-secrets claims.").

By contrast, the Will County Lawsuit is a narrow contract dispute between parties to the MOU, which does not resemble East Gate and NorthPoint's antitrust lawsuit for a litany of reasons. First, unlike the City, East Gate and NorthPoint are not in privity with HRE, affording the City greater rights to defend against HRE's contract claims. *See Ring v. Deming II, LLC*, 2015 IL App (1st) 131731-U, ¶ 12 ("[A] non-party to an agreement does not have standing to interpose claims or defenses based on the agreement."). Second, many of the City's defenses, including the City's ability to relinquish its police powers or the impact subsequent agreements between the City and HRE have on the MOU, are based on issues that are unique to the City. Third, the injury complained of in the Will County Lawsuit is the City's alleged breach of the MOU and the potential impairment on HRE's ability to collect revenue. Fourth, CenterPoint's market power is a non-issue in the Will County Lawsuit.

Conversely, East Gate and NorthPoint's *antitrust* lawsuit raises at least four wholly distinct issues outside the scope of the Will County lawsuit. First, the injury complained of is East Gate and NorthPoint's exclusion from the Joliet Intermodal Zone. Second, East Gate and NorthPoint will need to show that the anticompetitive effects of XII.B(3) of the MOU outweigh any procompetitive benefits. Third, CenterPoint and HRE will likely argue that their conduct is immunized under the state

action doctrine, which East Gate and NorthPoint will dispute. Fourth, instead of challenging HRE's interpretation of the XII.B(3) of the MOU, East Gate and NorthPoint's claims challenge that provision as an unreasonable restraint on trade.

By finding that the different sets of parties in the concurrent federal and state proceedings are "logically explained by the narrower scope of the dispute in the State Court Action," the district court should have found that the parties were not substantially the same. *Compare* A14 *with Loughran*, 2 F.4th at 648 ("[T]he question is whether the addition of new parties with different interests alters the central issues in the concurrent case, thereby undermining the 'overall similarity of the disputes.'"). Indeed, as the district court, CenterPoint, and HRE acknowledged, the resolution of the narrower dispute pending in state court will not resolve the broader dispute pending in federal court. A14; R-48, p. 14. The district court's acknowledgment that the state and federal disputes varied in scope should have prevented the district court from finding that the parties were substantially the same.

B.   The concurrent actions do not involve substantially the same issues.

To determine whether concurrent actions are parallel, the "critical question" is whether there is a *substantial likelihood* that the state litigation will dispose of *all claims* presented in the federal case. *Antosh v. Vill. of Mount Pleasant,* 99 F.4th 989, 994 (7th Cir. 2024) (citing *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 646 (7th Cir. 2011)). Any doubts should be resolved in favor of exercising jurisdiction. *Adkins*, 644 F.3d 483, 499 (7th Cir. 2011).

Regardless of outcome, it is undisputed, and the district court agreed, that the Will County Lawsuit will *not* dispose of all East Gate and NorthPoint's claims in the

federal action. Moreover, given the Will County Court's decision on the TRO, the district court's determination that there is a "substantial likelihood" that the state litigation will dispose of *any* claims is erroneous. Each point defeats a finding of issue parallelism and provide an independent basis for reversal.

1. Given the Will County Court's prior ruling, there is a substantial likelihood that the state litigation will not resolve *any* claims presented in the federal case.

East Gate and NorthPoint's claims are largely (but not exclusively) predicated on HRE's interpretation of MOU § XII.B(3): that it forbids the City from eliminating weight limits on the Temporary Connection necessary to make the Third Coast Development truck accessible. *See* generally R-1. East Gate and NorthPoint allege that such a restraint violates the Sherman Act and is being unlawfully used to perpetuate CenterPoint's monopoly over the Joliet Intermodal Zone. *Id*. In granting the TRO, the state court judge concluded "that HRE has a *high likelihood of success* on the merits," and that "[a]llowing trucks weighing in excess of 20,000 pounds to use the Temporary Connection would create alternative truck access" in violation of the MOU. A20-21 (emphasis added).

For purposes of assessing the likelihood of claim resolution in state court under *Colorado River* when the stay was entered, the most likely outcome of the Will County Lawsuit according to the judge presiding over that case is that HRE's interpretation is correct, and the City breached the MOU. *See* A19-22. If that occurs, *none* of East Gate and NorthPoint's claims will be resolved, a point CenterPoint and HRE concede: "the injunctive and declaratory relief sought by Plaintiffs here would be mooted *only* if [the City] ultimately prevails in state court[.]" R-48, p. 14. The district court also

recognized this possibility, noting that the only issue that would be resolved in the case before the court if HRE prevails in the State Court Lawsuit is that the meaning of "MOU § XII.B(3) will have been decided." A14. While this Court affirmed a *Colorado River* stay in *Gelab* where only one possible outcome would resolve the federal litigation, this case is distinguishable based on the language of the TRO finding that HRE has a "high likelihood of success." 99 F.4th at 429.

Instead of providing an adequate vehicle for the prompt resolution of the issues between the parties, the district court's *Colorado River* stay will only serve to delay East Gate and NorthPoint's claims. As such, reversal is warranted here. *Truserv Corp. v. Flegles, Inc.*, 419 F.3d 584, 593 (7th Cir. 2005) ("If there is any substantial doubt that the parallel litigation will be an adequate vehicle for the *complete and prompt* resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation.") (emphasis added). Thus, reversal is warranted on this basis.

> 2. The district court erred when it stayed the case despite acknowledging that, regardless of outcome in the Will County Lawsuit, some of East Gate and NorthPoint's claims would not be resolved.

The district court committed reversable error when it recognized that even if the City prevails in the Will County Lawsuit, some of East Gate and NorthPoint's claims would survive, but still stayed the case. A14. As discussed above, all of East Gate and NorthPoint's claims survive if HRE prevails in the Will County Lawsuit. Conversely, if the City prevails, East Gate and NorthPoint "might still bring attempted monopolization claims against Defendants," a point CenterPoint and HRE conceded. R-48, p. 14.

Given that no possible outcome of the Will County Lawsuit will offer "an adequate vehicle for the complete and prompt resolution of the issues between the parties," the Court should have denied CenterPoint and HRE's motion to stay because it destroys parallelism. *Truserv Corp., Inc.*, 419 F.3d at 593; *GeLab Cosms. LLC*, 99 F.4th at 428 (holding that cases are parallel if there is "a substantial likelihood that the state litigation will *dispose of all claims* presented in the federal case."). As the district court implicitly recognized that CenterPoint and HRE could ***not*** meet the "all claims" standard and yet still granted a *Colorado River* stay, reversal is warranted on this issue as well.

Because the district court had "no discretion to stay proceedings as to claims within exclusive federal jurisdiction" under *Medema* and *Adkins*, and because the concurrent actions are not parallel, this Court need not analyze whether "exceptional circumstances" exist under the *Colorado River* ten-factor test. *GeLab Cosms. LLC*, 99 F.4th at 430; *Medema*, 854 F.2d at 213.

IV. The District Court Abused Its Discretion When It Concluded that Exceptional Circumstances Warranted a Stay.

Under the *Colorado River* doctrine, Courts must weigh ten non-exhaustive factors to determine whether "exceptional circumstances" justify a surrender of their "virtually unflagging obligation" to exercise jurisdiction. *Adkins*, 644 F.3d at 501 (internal quotations omitted). "The evaluation must be made with the balance *heavily* weighted in favor of the exercise of jurisdiction." *Id*. (emphasis added). Here, even if relevant, none of the factors outweigh the district court's heavy obligation to exercise its jurisdiction over East Gate and NorthPoint's exclusively federal antitrust claims.

The ten relevant factors are: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiffs rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim. *Adkins*, 644 F.3d at 500-01.

The district court concluded that the first and eighth factors disfavored abstention, and the balance favored abstention. A15-17. In assessing these factors, the district court repeatedly erred on the facts and law.

1. Whether the state has assumed jurisdiction over property.

The district court properly concluded that this factor disfavored abstention. *Id*. at A15.

2. The inconvenience of the federal forum.

The district court erred in finding this factor favored abstention because the subject property was located in Will County, while most of the parties' attorneys are located in Chicago. *Id*. This factor only points toward abstention when the inconvenience is "so great" that "litigating the dispute in the federal forum would be exceptionally onerous" to the parties—which is not the case here. *Yeomans Chicago Corp. v. Goulds Pumps, Inc.*, No. 12 C 6822, 2013 WL 655519, at *3 (N.D. Ill. Feb. 21, 2013) (citing *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 19).

In *Loughran*, this Court found that the state and federal courthouses were "in close geographical proximity to one another and equally convenient" where the state court proceeding over the foreclosure action was pending in Grundy County and the federal suit was pending in the Northern District of Illinois. *Loughran*, 2 F.4th at 643, 650. The *Loughran* Court went on to find that this factor "does not support abstention." *Id.* at 650. Here, the courthouses in the concurrent actions are even closer than the two courts in *Loughran*: 46 vs. 62 miles. *United States v. Julius*, 14 F.4th 752, 756 (7th Cir. 2021) ("We and other courts have taken judicial notice of distance estimates from Google Maps."). Accordingly, the district court erred in finding this factor slightly favored abstention. A15 (finding this factor "weighs slightly in favor of abstention" because "the subject property [is] located in Will County.").

Moreover, aside from noting the proximity of the Joliet Intermodal Zone to the Will County Courthouse, the district court failed to explain why the Will County Court was more convenient to the parties. A15. It also noted that, while "[t]he two courthouses are both within the Northern District of Illinois, most of the parties' attorneys are located in Chicago, the parties are citizens of various states and one is headquartered in Oak Brook, Illinois." *Id.* Given that attorneys will be incurring time (and their parties' expense) traveling to and from the courthouses, the district court should have found this factor disfavored abstention.

3. The desirability of avoiding piecemeal litigation.

The district court erroneously found that this factor favored abstention, stating that "both cases ultimately turn on the meaning of the MOU § XII.B(3)" and "[t]hus,

27

the possibility of issues being left unresolved by piecemeal litigation is not relevant here." A16. This finding is erroneous for at least three reasons.

First, piecemeal litigation cannot be avoided due to East Gate and NorthPoint's Sherman Act claims that invoke the exclusive jurisdiction of the federal courts. East Gate and NorthPoint's need to resolve their Sherman Act claims in a federal forum is the product of federal law, which "requires piecemeal resolution" of East Gate and NorthPoint's Sherman Act claims. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 2-3.

Second, the desirability of avoiding piecemeal litigation exists "only when there is evidence of a strong federal policy that all claims should be tried in the state courts." *Ryan v. Johnson*, 115 F.3d 193, 197-98 (3d Cir. 1997); *Colorado River*, 424 U.S. at 819 ("The clear federal policy evinced by [the McCarran Amendment] is the avoidance of piecemeal adjudication of water rights in a river system."). That is not the case here. Nor should the presence of state law issues be used to overrule Congress's conferral of exclusive jurisdiction over Sherman Act claims.

Third, the Will County Lawsuit cannot offer an adequate vehicle for the complete and prompt resolution of the issues between the parties because, as explained above, it will not resolve all of East Gate and NorthPoint's claims regardless of outcome. As such, the district court erred in finding this factor favored abstention because abstention will merely delay East Gate and NorthPoint's claims instead of avoiding piecemeal litigation.

4. The order in which jurisdiction was obtained by the concurrent fora.

The district court found this factor favored abstention because HRE filed its lawsuit first. A16. However, at no time has (or could) the state court proceeding

28

encompassed jurisdiction over East Gate and NorthPoint's Sherman Act claims. *See Johns v. Paycor, Inc.*, No. 3:20-CV-264-DWD, 2024 WL 2049737, at *7 (S.D. Ill. May 8, 2024) (refusing to abstain because the earlier-filed state court claims materially differed from the claims filed in federal court making the federal suit first to acquire jurisdiction over dispute). *See also Bates v. Laminack*, 938 F. Supp. 2d 649, 665 (S.D. Tex. 2013) (noting that concurrent state court action was pending much longer, but finding this factor disfavored abstention because "at no time has the state court proceeding encompassed jurisdiction over these Plaintiffs and their claims."). After finding that concurrent state and federal claims lacked issue parallelism despite having the same defendant and same cause of action, the *Johns* court correctly determined that it was the court that "first acquired jurisdiction over the claims." *Id*. at *6-7. In *Johns*, the plaintiff was a non-party to the concurrent state court proceedings, having been excluded from the proposed state-court class. *Id*. at *7. As noted above, the same is true here given East Gate and NorthPoint's status as non-parties and the absence of issue parallelism.

Thus, the Will County Lawsuit should not be treated as a "first filed" proceeding in the *Colorado River* analysis and the district court erred in doing so. *Id*.

5. The source of governing law.

The district court erred in finding this factor favored abstention by ignoring longstanding precedent that the existence of federal question jurisdiction weighs heavily against abstention. *Moses H. Cone*, 460 U.S. at 26 (holding that "the presence of federal-law issues must always be a major consideration weighing against surrender"). *See also Tyrer v. City of S. Beloit, Ill.*, 456 F.3d 744, 757 (7th Cir. 2006) ("The

existence of a federal question typically "weighs heavily against abstention."); *Sverdrup Corp. v. Edwardsville Cmty. Unit Sch. Dist. No. 7,* 125 F.3d 546, 549 (7th Cir.1997) (same); *Illinois Bell Tel. Co. v. Illinois Com. Comm'n,* 740 F.2d 566, 570 (7th Cir. 1984) (same). Here, the district court did so based on an incorrect determination that East Gate and NorthPoint's "[F]ederal claims depend largely on the interpretation of MOU § XII.B(3)" despite finding that, as discussed above, their exclusively federal Sherman Act claims will go forward regardless of the outcome of the Will County Lawsuit. A16. As such, the district court erred in finding this factor favored abstention.

6. The adequacy of state-court action to protect the federal plaintiff's rights.

The district court erred in finding this factor favored abstention because "Defendants have all but waived any objection to Plaintiffs' ability to meaningfully participate in the State Court Action." *Id*. This determination ignores the significant limitations East Gate and NorthPoint would face by attempting to bring their claims in Illinois state court.

First, as noted throughout East Gate and NorthPoint's response brief, they cannot bring their Sherman Act claims in Illinois state court. *See* R-64, pp. 8-9, 15. While Defendants argue that East Gate and NorthPoint could have brought claims based on the Illinois Antitrust Act, there are significant differences between the Sherman Act and the Illinois Antitrust Act. For example, unlike the Sherman Act, the Illinois Antitrust Act only allows treble damages for rule of reason or monopolization cases if (1) the violation is "willful" and (2) the court uses its discretion to award treble damages. *See* 740 ILCS10/7(2). Likewise, the Illinois Antitrust Act "does not incorporate

structural theory, i.e., there is no liability in Illinois for mere existence of monopoly plus intent to exercise power, liability in Illinois turns on abuse of monopoly power[.]" *Wabash Pub. Co. v. Flanagan*, No. 89 C 1923, 1990 WL 19977, at *4 (N.D. Ill. Feb. 27, 1990). Moreover, Illinois law disfavors defenses based on antitrust claims in contract actions. *See First Federal S L Ass'n v. Faubion*, 475 N.E.2d 989, 991 (Ill. App. 1985) ("[A]s a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court.").

Given the above, pursuing Illinois Antitrust Act claims in state court denies NorthPoint and East Gate their preferred forum, relevant standards, and potential remedies. *See Adkins*, 644 F.3d at 500, 502 (disagreeing with the district court's conclusion that the state court was fully capable of providing an adequate remedy given differences between state law claims and claims asserted in concurrent federal proceeding).

Finally, unlike federal courts that routinely address antitrust claims, Illinois circuit courts and the state's appellate courts may not have the same level of familiarity. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 726 F.2d 1150, 1182 (7th Cir. 1984) (J. Cudahy, dissenting), *rev'd,* 470 U.S. 373 (1985) (noting that "federal judges may have greater experience in the adjudication of federal antitrust claims" and that "plaintiffs should have the right to choose their forum, particularly when issues of relative expertise are at stake, without their choice being arbitrarily dictated under a rigid doctrine of federal abstention."). *See also Pelfresne v. Stephens*, 35 F. Supp. 2d 1064, 1073-74 (when "the source of governing law . . . is federal," the "plaintiffs' rights

will not necessarily be adequately protected by the state court action (factor six)"). As such, the district court should have determined that this factor disfavored abstention.

7. The relative progress of state and federal proceedings.

The district court erred in finding this factor favored abstention given that the concurrent actions would be in virtually the identical procedural postures when the district court granted the stay. A16. Indeed, both cases were at the outset of discovery. East Gate and NorthPoint moved for expedited discovery in the federal case and the parties in the state case had just propounded written discovery responses. R-64, p. 18, 20. Moreover, in both cases, the parties were in the process of moving forward on motions for preliminary injunction. *Id.* at p. 18.

In the Will County lawsuit, there is a preliminary injunction hearing scheduled for March 2025 with six weeks of post-hearing briefing and virtually no discovery has occurred. *See id.* pp. 18-20. In the federal lawsuit, East Gate and NorthPoint filed their motion for preliminary injunction on July 15, 2024. *See* R-23, R-25. Conceivably, had the court entered a hearing date like the one requested by East Gate and NorthPoint (*see* R-23, pp. 2-3), this case would be closer to resolution than the Will County Lawsuit. "The question whether the state litigation has reached an advanced stage turns not on the amount of discovery completed but on how far the state court has progressed toward a final resolution." *Huon*, 657 F.3d at 648. As such, the district court should have determined that this factor disfavored abstention.

8. The presence or absence of concurrent jurisdiction.

The district court properly found this factor disfavored abstention. A16-17.

9. The availability of removal.

The district court erred in finding that this factor favored abstention because HRE's lawsuit was not removable and this factor is intended to prevent parties from circumventing the removal statute. A17. As a nonparty to the Will County Lawsuit, East Gate and NorthPoint are not circumventing the removal statute. Rather, they are pursuing their Sherman Act claims in the only forum available to them: federal court. *See Grdinich v. Plan Comm'n for Town of Hebron Indiana*, No. 2:18-CV-146-JVB-JEM, 2020 WL 3868704, at *5 (N.D. Ind. July 9, 2020). "The unavailability of removal counsels against abstention, but it is mitigated by the availability of directly filing the claims in federal court." *Id*. As such, this factor was neutral or only slightly favored abstention.

10. The vexatious or contrived nature of the federal claim.

By misapplying this factor, the district court erred in concluding that East Gate and NorthPoint's claims were vexatious or contrived based on the timing of the suit. A17.

Cases are vexatious or contrived where they are filed to circumvent case deadlines in the state court action (*Baek v. Clausen*, 886 F.3d 652, 667 (7th Cir. 2018)), where they are doomed from the start (*Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 527 (7th Cir. 2021)), identical to the claims filed in state court (*Id*.), or when the plaintiff could have sued the defendant in the original state court proceedings. *Freed*, 756 F.3d at 1024. None of those scenarios apply here. East Gate and NorthPoint are not circumventing deadlines in the Will County Lawsuit as they are non-parties. Nor are their claims destined to fail. Far from it, as East Gate and NorthPoint filed a motion for preliminary injunction that was well-supported by expert and lay witness

declarations, incurring considerable expense in order to carry their *prima facie* burden. R-25 Nor are they the plaintiff in the concurrent state proceeding that simply elected not to file claims against CenterPoint and HRE and, critically, they would not be able to bring their Sherman Act claims in state court even if they wished to do so.

Further, East Gate and NorthPoint's claims are not intended to harass HRE and CenterPoint. East Gate and NorthPoint are seeking to get to the merits of their claims as expeditiously as possible given the strength of their claims and the magnitude of the harm they are facing. *See generally* R-23, R-25. Instead of being vexatious or contrived, East Gate and NorthPoint's claims are serious and well-supported antitrust claims that warranted the filing of a preliminary injunction supported by rigorous economic analysis comparing commercial warehouse rates in multiple intermodal warehouse markets (R-27), a traffic study of the major thoroughfares in around the Joliet Intermodal Zone to forecast traffic flows and the impact the Third Coast Development would have on HRE's toll revenue (R-35), and multiple industry experts. *See* R-28, R-30, R-35. Therefore, the district court erred in concluding that this factor favored abstention.

* * *

In sum, there are no exceptional circumstances that exist to justify *Colorado River* abstention given that few, if any, of the factors weigh in favor of abstention and most weigh against it, including—most prominently—the source of governing law and Congress's express directive necessitating piecemeal litigation for exclusively federal Sherman Act claims. Coupling the above factors with the heavy presumption

against abstention shows that the District Court abused its discretion in abstaining under *Colorado River*.

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed.

Dated October 4, 2024          Respectfully submitted,

<div style="margin-left:40%">

*/s/ Robert J. Palmersheim*
Robert J. Palmersheim
Timothy G. Parilla
Honigman LLP
155 N. Wacker Dr., Ste. 3100
Chicago, IL 60606
(312) 701-9300
rpalmersheim@honigman.com
tparilla@honigman.com

*Attorneys for East Gate-Logistics Park Chicago, LLC and NorthPoint Development, LLC*

</div>

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing motion conforms to the type-volume limitations of Circuit Rule 32 because it contains 9,326 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

I further hereby certify that the foregoing motion complies with the typeface and type-style requirements of Circuit Rule 32 because the document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font in the body of the brief and 11-pont font in the footnotes.

Dated: October 4, 2024            /s/ Robert J. Palmersheim
                                        Robert J. Palmersheim

                                        *Attorney for Appellants*

**CIRCUIT RULE 30(D) STATEMENT**

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by

Circuit Rule 30(a) and (b) are included in the Appendix.

Dated: October 4, 2024            /s/ Robert J. Palmersheim
                                  Robert J. Palmersheim


                                  *Attorney for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which constitutes service on all counsel of record, registered filing users, pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Circuit Rule 25(a).

/s/ Robert J. Palmersheim
Robert J. Palmersheim

# APPENDIX

## TABLE OF CONTENTS TO REQUIRED SHORT APPENDIX

1. Memorandum Opinion and Order (entered 09/23/24) ………………...…………..A01-A18

2. Temporary Restraining Order (entered 03/19/2024) ………..………………….A19-A23

3. Memorandum of Understanding (entered 12/19/2016) ...…………………………A24-A40

4. Transcript of Proceedings (excerpts) (entered 08/30/2024) ………………………A41-A49

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

East Gate-Logistics Park Chicago, LLC;
and NorthPoint Development, LLC,

      Plaintiffs,

v.

CenterPoint Properties Trust; CenterPoint
Joliet Terminal Railroad, LLC; and
Houbolt Road Extension JV, LLC,

      Defendants.

Case No. 24 C 3742

Hon. LaShonda A. Hunt

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs East Gate-Logistics Park Chicago, LLC ("East Gate") and NorthPoint Development, LLC ("NorthPoint") bring this antitrust action against Defendants CenterPoint Properties Trust ("CPT"), CenterPoint Joliet Terminal Railroad, LLC ("CJTR"), together with CPT, "CenterPoint"), and Houbolt Road Extension JV, LLC ("HRE") based on the theory that Defendants have monopolized and blocked competitors from the commercial warehouse market near two large railroad terminals. Currently before the Court are Defendants' motions to dismiss for lack of jurisdiction and, in the alternative, to stay and/or to dismiss for failure to state a claim upon which relief can be granted. The Court previously stayed consideration of Plaintiffs' motions for preliminary injunction and expedited discovery pending a ruling on Defendants' motions. For the reasons discussed below, the Court denies Defendants' motion to dismiss for lack of jurisdiction (Dkt. 61) and grants their motion for a stay (Dkt. 48). Consequently, Plaintiffs' motions for a preliminary injunction (Dkt. 23) and expedited discovery (Dkt. 45) and Defendants' motion to dismiss for failure to state a claim (Dkt. 50) are denied without prejudice.

# BACKGROUND

## I. Joliet Intermodal Zone

Located approximately 40 miles south of Chicago, Elwood and Joliet, Illinois, are home to the BNSF Logistics Park Chicago and the Union Pacific Intermodal Terminal, two of the largest intermodal terminals in the United States (together with the surrounding area, the "Joliet Intermodal Zone"). (Compl. ¶¶ 2, 30, Dkt. 1). Each year, the freight that passes through the Joliet Intermodal Zone accounts for approximately 3-4% of gross domestic product. (*Id.* ¶ 2). An "intermodal terminal" is a facility where freight is transferred from one mode of transportation to another. (*Id.* ¶ 1). In this instance, freight arrives to the Joliet Intermodal Zone by rail and is transferred to trucks. (*Id.* ¶ 2). During transfer, freight must often be stored, repackaged, broken up, and/or combined with other goods in warehouses and distribution facilities. (*Id.* ¶ 1). Close proximity to the BNSF and Union Pacific terminals significantly reduces the cost of transfer such that nearby warehouse and distribution facilities can charge a premium for rent. (*Id.* ¶ 35).

## II. Parties

In the early 2000's, CenterPoint began purchasing land in the Joliet Intermodal Zone to develop warehouse and distribution space. (*Id.* ¶ 31). CenterPoint currently owns approximately 6,400 acres of land and 17 million square feet of warehouse space, comprising the CenterPoint Intermodal Center – Joliet/Elwood. (*Id.* ¶¶ 3, 33). More than 50 tenants currently rent from CenterPoint, including household names like Walmart, Samsung, Home Depot, and others. (*Id.* ¶¶ 31-32). Starting in 2013, NorthPoint (and later East Gate) began to plan a competing warehouse development in the Joliet Intermodal Zone. (*Id.* ¶ 5). To that end, East Gate has purchased 3,200 acres of land and is currently developing three warehouses comprising about 3.4 million square feet of space. (*Id.* ¶ 6).

2

A02

### III.    <u>Memorandum of Understanding dated December 19, 2016</u>

CenterPoint learned about East Gate's plans in early 2016. (*Id.* ¶ 7). According to East Gate, CenterPoint embarked on a plan to block East Gate's entry to the market through an agreement to build a toll bridge connecting the Joliet Intermodal Zone with the nearest interstate highway. (*Id.* ¶ 8). Under the agreement, a Memorandum of Understanding dated December 19, 2016 (the "MOU"), CenterPoint, the City of Joliet, the Will County Department of Transportation, and the Illinois Department of Transportation agreed that CenterPoint would finance the building of the toll bridge. (*Id.*; *see* Compl. Ex. A (MOU)). CenterPoint subsequently assigned all of its rights, obligations, interest and title in the MOU to HRE. (*Id.*) Central to this case, Section XII.B(3) of the MOU provides as follows:

> **The CITY and COUNTY agree that they will take no steps or actions to** (1) eliminate [CenterPoint's] authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the [CenterPoint] Intermodal Center on which trucks may travel or build new roads that enter or exit the [CenterPoint] Intermodal Center on which trucks may travel; and **(3) eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the [CenterPoint] Intermodal Center or on roads that are adjacent to the [CenterPoint] Intermodal Center.**

(MOU § XII.B(3) (emphasis added)). The term "adjacent to the [CenterPoint] Intermodal Center" is a defined geographic area (the "Study Area"), which is set forth in a map attached to the MOU. (*See* MOU § XII.D). The Study Area essentially covers the north half of the Joliet Intermodal Zone, including the Union Pacific terminal, the CenterPoint Intermodal Center – Joliet, and East Gate's development. (*See* MOU Ex. A (Study Area) at 18, Dkt. 1-1).[1]

---

[1] Unless otherwise noted, all page numbers in citations to documents filed on the docket are to page numbers on the CM/ECF headers of the filings, not page numbers at the bottom of the page.

### IV. <u>East-Gate's Temporary Connection to Millsdale Road</u>

As part of East Gate's development plans, it obtained approval from the City of Joliet for various zoning, subdivision, and land development changes. (Compl. ¶ 12). In 2021, the City of Joliet agreed to allow East Gate to construct a temporary connection to Millsdale Road and permit trucks to use a portion of the road on which truck traffic was previously prohibited due to weight restrictions. (*Id.* ¶ 12, 59). The temporary connection would allow East Gate's customers to travel directly between their warehouses and the Joliet Intermodal Zone until a permanent overpass bridge could be built. (*Id.* ¶ 63). Without the temporary connection, East Gate's customers would have no way to travel between East Gate's facilities and the Joliet Intermodal Zone due to existing weight restrictions on local roads.[2] (*Id.* ¶ 43).

### V. <u>State Court Action</u>

On May 9, 2022, HRE filed a lawsuit against the City of Joliet in the Circuit Court of Will County, Illinois, *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138 (Will Cnty. Cir. Ct.) (the "State Court Action"), seeking to enforce the MOU through an injunction prohibiting the City from temporarily allowing trucks to use Milldale Road. (*Id.* ¶ 13).[3] HRE maintains that the purpose of the suit is to avoid potential lost toll bridge revenue caused by the grant of a temporary connection, while East Gate believes that HRE is attempting to block competitors from the market. (*Id.* ¶¶ 10, 14).

---

[2] At the August 30, 2024 hearing in this matter, East Gate's counsel reported that one tenant currently has limited permission to use an indirect route to access the Joliet Intermodal Zone from East Gate's facilities.

[3] The Verified Complaint in the State Court Action names HRE as Plaintiff, CenterPoint as "Interested Parties/Plaintiffs," the City of Joliet as Defendant, and East Gate and other parties as "Interested Parties." *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138, Verified Complaint (Will Cnty. Cir. Ct. May 9, 2022).

Although the state trial court initially dismissed the State Court Action, the state appellate court reversed that ruling based on the conclusion that HRE had sufficiently pled a claim that the City of Joliet violated MOU § XII.B(3) by taking steps or actions to allow East Gate to use a temporary connection to allow trucks to access a portion of Millsdale Road. *Houbolt Rd. Extension JV, LLC v. City of Joliet*, 2023 IL App (3d) 220433-U, ¶¶ 46-52, *appeal denied*, 223 N.E.3d 633 (Ill. 2023) (the "State Court Appeal"). On remand, the state trial court held a hearing and issued a temporary restraining order dated March 19, 2024, enjoining the City of Joliet from permitting use of the temporary connection to Millsdale Road (the "State Court TRO"). (Compl. ¶ 16). The parties to the State Court Action are currently engaged in discovery, with a preliminary injunction hearing set for March 17, 2025, followed by six weeks of post-hearing briefing. *Houbolt Road Extension JV, LLC v. City of Joliet*, No. 22 MR 138, Order (Will Cnty. Cir. Ct. Aug. 5, 2024).

## VI.  **Procedural History**

On May 8, 2024, less than two months after entry of the State Court TRO, Plaintiffs filed this action in Federal court seeking to invalidate MOU § XII.B(3) under antitrust law and to restore truck access to Millsdale Road via the temporary connection, among other things. (*See* Compl. at 46-47). In July, Plaintiffs moved for entry of a preliminary injunction and expedited discovery. (Dkts. 23 & 45, respectively). In response, Defendants filed motions to stay this case pending the outcome of the State Court Action and for dismissal based on failure to state a claim or lack of subject-matter jurisdiction. (Dkts. 48, 50, 61). Consideration of Plaintiffs' preliminary injunction and expedited discovery motions has been stayed pending resolution of Defendants' motions. (Dkt. 58). The stay and dismissal motions were fully briefed as of August 29, 2024, and the parties presented oral arguments on August 30, 2024. (Dkts. 87, 88). Following the hearing, the Court

took the matters under advisement. (Dkt. 88). Having considered the briefs, arguments, and relevant authority, the Court is ready to rule.

## DISCUSSION

Defendants' motions present three discrete issues. First, Defendants argue that the Complaint should be dismissed for lack of subject-matter jurisdiction under the *Rooker-Feldman* doctrine. Second, if the case is not dismissed for lack of jurisdiction, Defendants contend that it should be stayed pending resolution of the State Court Action under the *Colorado River* doctrine. Finally, if neither doctrine applies, Defendants challenge whether the Complaint states a claim upon which relief can be granted under Rule 12(b)(6). "Because the *Rooker-Feldman* doctrine operates as a 'jurisdictional bar,'" the Court must consider that motion first. *Gilbank v. Wood Cnty. Dep't of Hum. Servs.*, 111 F.4th 754, 764 (7th Cir. 2024) (quoting *Andrade v. City of Hammond*, 9 F.4th 947, 948 (7th Cir. 2021)).

### I.    Subject-Matter Jurisdiction

When ruling on a motion to dismiss for lack of jurisdiction, the Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023) (quoting *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021)). In addition, the Court may consider "whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993) (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979)). Thus, the Court looks to the allegations of the Complaint, as well as the affidavits submitted by the parties, in evaluating whether jurisdiction exists.

A06

Sitting *en banc*, the Seventh Circuit recently issued a comprehensive opinion addressing the "limited circumstances" in which the *Rooker-Feldman* doctrine applies and discussing the elements that must be considered by a district court making that determination. *See Gilbank*, 111 F.4th at 764-766. Essentially, the doctrine applies "only in 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 286 (2005)). In other words, *Rooker-Feldman* has limited application and "must neither interfere with [a Federal court's] 'virtually unflagging obligation' to exercise the jurisdiction that Congress has granted . . . nor swallow up issues that are properly resolved under abstention or claim-and issue-preclusion doctrines." *Gilbank*, 111 F.4th at 765-766 (quoting *Exxon Mobil*, 544 U.S. at 283, 291; *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 645 (7th Cir. 2011); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Thus, "[i]f a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Exxon Mobil*, 544 U.S. at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

With those guiding principles in mind, the *Rooker-Feldman* doctrine applies when five elements are satisfied: (1) "the federal plaintiff must have been a state-court loser[;]" (2) "the state-court judgment must have become final before the federal proceedings began[;]" (3) "the state-court judgment must have caused the alleged injury underlying the federal claim[;]" (4) "the claim must invite the federal district court to review and reject the state-court judgment[;]" and (5) the plaintiff must have had "a reasonable opportunity to raise her federal issues in the state courts."

*Id.* at 766. Although the State Court TRO likely effectuated the alleged injury underlying Plaintiffs' claims (third element), the Complaint effectively invites the Court to review and reject the State Court TRO (fourth element), and it is questionable whether Plaintiffs had a reasonable opportunity to raise their Federal antitrust issues in the State Court Action (fifth element), the Court is not satisfied Defendants have established that Plaintiffs lost in state court or that the State Court TRO became final before this Federal action began.

With respect to the first element, the Supreme Court has "held *Rooker-Feldman* inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (citing *Johnson v. De Grandy,* 512 U.S. 997, 1006 (1994)). In addition, because the doctrine is circumscribed and "not simply preclusion by another name[,]" it "does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance*, 546 U.S. at 466. Considering the facts of this case, Illinois procedure, and the overarching purpose of the *Rooker-Feldman* doctrine, the Court concludes that East Gate's limited involvement in the State Court Action does not make it a "party" for purposes of the *Rooker-Feldman* doctrine.

In the State Court Action, HRE designated East Gate as an "Interested Party" only and did not name NorthPoint at all. As a result, East Gate did not file an appearance, respond to the complaint, brief the initial dismissal, subsequent appeal, or TRO proceedings, or appeal the TRO.[4] Nor did East Gate file a petition to intervene or any other request aimed at inserting itself into the

---

[4] Although it appears that East Gate may have been permitted to be more active in the State Court Action (as Defendants here contend), the Court will not speculate as to the extent to which East Gate would have been allowed to participate.

case as a party. It appears that East Gate's only activity in the State Court Action has been filing a 3-page motion to strike objecting to the use of discovery obtained in other litigation, (Dkt. 51-5), the payment of some of the City of Joliet's legal bills (Dkt. 64 at 15), and appearance at two hearings in which they did not meaningfully participate, (Dkts. 72-1, 72-2). The scope of the State Court TRO is limited to the contractual relationship between HRE and the City of Joliet and no relief is entered against East Gate, although it appears undisputed that East Gate is in contractual privity[5] with the City of Joliet and its interests are affected by the TRO.

The Illinois Code of Civil Procedure includes a comprehensive set of rules governing parties to a civil action in Illinois state court. *See* 735 ILCS 5/2-401-5/2-417. The relevant provisions refer to the "party" commencing the action as the "plaintiff" and the "adverse party" as the "defendant" and set forth the procedures governing joinder of parties, third-party proceedings, and intervention, among other things. *See id.* The Code also contemplates the entry of declaratory judgments "at the instance of anyone interested in the controversy" and declaration of "the rights of the parties interested." *See* 735 ILCS 5/2-701(a). Although Defendants suggest that the references to interested parties in 735 ILCS 5/2-701(a) expand what a "party" is under Illinois law to include "interested parties" for purposes of *Rooker-Feldman*, the Court reads the provision to merely define who may bring a declaratory action and who a declaratory judgment may be entered against. Of course, that reading of the text affects who should or may be a plaintiff, defendant, or intervener in a declaratory action, but those determinations hinge on the facts of each particular case and are not assumptions to be made in all actions for declaratory relief. Thus, a person may be named as an "interested party" or have an interest in the controversy at the heart of a declaratory

---

[5] The Court expresses no opinion as to the effect of such privity for purposes of preclusion.

action, but not be a "party" to the case if they are not designated as such or if relief is not entered against them. That appears to be East Gate's role thus far in the State Court Action.

Here, East Gate's limited involvement in the State Court Action and absence as a party against whom any relief was entered by the TRO falls short of making it a party for purposes of the *Rooker-Feldman* doctrine. The bottom line is that the State Court Action is a dispute between two parties to a contract over the interpretation of a contract provision and the State Court TRO enters relief as between those parties. If East Gate were a named defendant or the State Court TRO entered relief against East Gate specifically, the result may be different, but being tangentially affected by virtue of being in contractual privity with the City of Joliet is not enough. Accordingly, the Court declines to expand the "limited circumstances" in which *Rooker-Feldman* applies to include cases in which a Federal plaintiff merely has an interest in the outcome of state court litigation but is not a party to the proceedings. Because East Gate is not a party to the State Court Action for purposes of *Rooker-Feldman*, it is not a "state-court loser," and the doctrine does not apply.

The analysis could stop there, but the "final judgment" requirement of the *Rooker-Feldman* doctrine provides an additional reason against its application. Two recent Seventh Circuit cases are instructive in this regard. In *Bauer v. Koester*, the plaintiffs "argue[d] that *Rooker-Feldman* applies only to *final* state-court judgments and thus does not apply to the state court's foreclosure judgment [against them], which was not a final appealable order under Illinois law." 951 F.3d 863, 867 (7th Cir. 2020) (emphasis in original). The court first noted the general rule that "the *Rooker-Feldman* doctrine 'does not apply independently to interlocutory orders[,]'" *id.* (quoting *Kowalski v. Boliker*, 893 F.3d 987, 995 (7th Cir. 2018)), but then acknowledged "interlocutory orders entered prior to the *final disposition* of state court lawsuits are not immune from the jurisdiction-stripping

powers of *Rooker-Feldman*[,]" *id.* (quoting *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 742 (7th Cir. 2016) (emphasis added)). Because the plaintiffs had paid the monetary judgment and a satisfaction of judgment had been filed in the foreclosure proceeding, the Seventh Circuit concluded that the case was "effectively final" and there was a "judgment" against them under *Rooker-Feldman. Bauer*, 951 F.3d at 867. More recently, in *Bryant v. Chupack*, at "the time [the] federal suit began, the state judiciary had ruled that the banks were entitled to foreclose on both parcels, but they had yet to be sold, and the court had not entered final judgments specifying who owe[d] how much to whom." 93 F.4th 1029, 1031 (7th Cir. 2024), *reh'g denied*, No. 22-3265, 2024 WL 1023769 (7th Cir. Mar. 8, 2024). Thus, when the plaintiffs commenced the Federal case, they "had lost a battle in state court but had not yet lost the war." *Id.* at 1032. But by the time the case reached the Seventh Circuit, "the state litigation [was] over by any standard." *Id.* at 1033. As a result, the law of preclusion, not the *Rooker-Feldman* doctrine, applied to the suit. *Id.*

The takeaway from these cases is that the touchstone of finality for purposes of *Rooker-Feldman* is not necessarily whether a particular order is appealable, as Defendants suggest, but rather, if the state court "case . . . is effectively final[,]" *Bauer*, 951 F.3d at 867, "final in any possible sense" or "over by any standard[,]" *Bryant*, 93 F.4th at 1032-33; *cf. Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 400 (7th Cir. 2023) (child custody order was "final" under *Rooker-Feldman* despite the court's "continuing management" of child custody issues because state law provided that it superseded the prior judgment and was immediately appealable).

Having been commenced in May 2022, the State Court Action is already in its third year. But the case is nowhere near final or over, with the State Court TRO having just been entered in March 2024, the parties engaged in motion practice on the responsive pleadings, and ongoing discovery in preparation for a March 2025 preliminary injunction hearing. Although it would be a

stretch to say that Plaintiffs "lost the battle but not the war" when the State Court TRO was entered—since Plaintiffs are not a party to the State Court Action—the saying still accurately describes the posture of the State Court Action when this Federal suit was filed. To conclude that a case still so far from a final decision on the merits is "final" for purposes of *Rooker-Feldman* would ignore clear Seventh Circuit and Supreme Court precedent cautioning district courts against a wide-reaching application of the *Rooker-Feldman* doctrine. *See, e.g., Lance v. Dennis*, 546 U.S. 459, 464 (2006) ("Neither *Rooker* nor *Feldman* elaborated a rationale for a wide-reaching bar on the jurisdiction of lower federal courts, and our cases since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule.") (listing cases). Accordingly, despite the immediate appealability of the State Court TRO, the State Court Action itself is far from over, so it does not constitute a final judgment for purposes of *Rooker-Feldman*. Having determined that "the narrow ground occupied by *Rooker-Feldman*" does not warrant dismissal of this action for lack of subject-matter jurisdiction, *Exxon Mobil*, 544 U.S. at 284, the Court now turns to whether the case should be stayed pending resolution of the State Court Action.

## II.  **Abstention**

In *GeLab Cosms. LLC v. Zhuhai Aobo Cosms. Co*, the Seventh Circuit recently canvased the *Colorado River* abstention doctrine and set forth the analysis district courts should apply in determining whether a stay is appropriate. 99 F.4th 424 (7th Cir. 2024). Essentially, "[o]nly if 'the presence of a concurrent state proceeding' makes abstention a matter of 'wise judicial administration' may a federal court refrain from doing the job the Constitution and Congress assigned to it." *Id.* at 428 (quoting *Colorado River*, 424 U.S. at 818); *see also Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014) ("The primary purpose of the *Colorado River* doctrine is to conserve both state and federal judicial resources and prevent inconsistent

12

A12

results."). In determining whether to abstain, a district court should conduct "two inquiries, both of which put a thumb on the scale against abstention." *GeLab*, 99 F.4th at 428.

First, the court must consider "whether the state and federal court proceedings are actually parallel; if not, then the federal case must go forward." *Id.* "Cases are parallel if there is 'a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *Id.* (quoting *Freed*, 756 F.3d at 1018). "Two cases need not be identical to be parallel, but they must involve 'substantially the same parties [ ] contemporaneously litigating substantially the same issues.'" *GeLab*, 99 F.4th at 428 (quoting *Freed*, 756 F.3d at 1019).

If the proceedings are actually parallel, "the second question is whether exceptional circumstances warrant abstention." *GeLab*, 99 F.4th at 428 (citing *Huon*, 657 F.3d at 646-647). The Seventh Circuit has identified ten non-exhaustive factors relevant to deciding whether abstention is justified by exceptional circumstances. *GeLab*, 99 F.4th at 430. In considering those factors, a district court must engage in a "careful weighing of the factors pertinent to the case at hand[.]" *Id.* at 431 (quoting *Sverdrup Corp. v. Edwardsville Comm. Unit Sch. Dist. No. 7*, 125 F.3d 546, 550 (7th Cir. 1997)).

As discussed above, the named parties in the State Court Action and this case are not the same. But that difference can be logically explained by the narrower scope of the dispute in the State Court Action, which involves only a contract between HRE and the City of Joliet and the interpretation and enforceability of a specific provision. Likewise, the parties named in this suit makes sense given that the claims here are based on antitrust law. Despite these formal differences between the parties, the two cases "involve *substantially* the same parties" because "the parties 'have nearly identical interests.'" *GeLab*, 99 F.4th at 429 (emphasis in original) (quoting *Freed*, 756 F.3d at 1019). Indeed, the respective parties' identities and interests are substantially aligned

13

A13

in both cases. CenterPoint was the original party to the MOU and assigned its interests to HRE, has a major financial interest in HRE, and exercises control over HRE's operations. CenterPoint and HRE stand to benefit from enforcement of MOU § XII.B(3) through the State Court Action and are exposed to various related business and legal risks by the antitrust claims in this case. NorthPoint was East Gate's predecessor in its Joliet Intermodal Zone development and remains East Gate's manager. Although NorthPoint and East Gate are not parties to the State Court Action, the viability of their development in the Joliet Intermodal Zone rises and falls with the outcome of both the State Court Action and this case because their customers' ability to access the terminals from their warehouses is essential to operations and overall viability of the development.

The State Court Action and this Federal case are also "predicated on the same facts," and "will be resolved largely by reference to the same evidence[.]" *GeLab*, 99 F.4th at 429 (quoting *Tyrer v. City of S. Beloit, Ill.*, 456 F.3d 744, 752 (7th Cir. 2006)). True, the State Court Action involves contract interpretation, and this case is based on antitrust law. But at bottom, both cases revolve around MOU § XII.B(3). If the City of Joliet ultimately prevails in the State Court Action, Plaintiffs' claims here will mostly become moot to the extent they depend on Defendants' interpretation and enforcement of the MOU. Even then, to the extent Plaintiffs seek to move forward with their claims based on damages caused by Defendants' prior conduct, a decision on the meaning of MOU § XII.B(3) is logically antecedent to any such determination. If HRE prevails, then the meaning of MOU § XII.B(3) will have been decided and the issues here will be greatly narrowed. Either way, the cases involve largely the same evidence, and to the extent additional evidence is relevant to the Federal claim, it will only become relevant if the state court first accepts HRE's interpretation of the MOU.

14

In sum, if the State Court Action ultimately resolves in the City of Joliet (and East Gate's) favor, "there is 'a substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *GeLab*, 99 F.4th at 428 (quoting *Freed*, 756 F.3d at 1018). Although this case is couched in antitrust, state contract issues predominate. The primary reason Plaintiffs filed this action is to invalidate the MOU provision that impacts their pecuniary interests. Accordingly, the cases are parallel, and the Court must therefore proceed to the second inquiry of carefully weighing the factors relevant to whether there are exceptional circumstances that warrant abstention. Just as the Seventh Circuit did, the Court will address each factor and indicate which favor abstention, and which do not. *See GeLab*, 99 F.4th at 430.

1. **Whether the state has assumed jurisdiction over property—Disfavors Abstention.** It is undisputed that the state has not assumed jurisdiction over property. Therefore, this factor weighs against abstention.

2. **The inconvenience of the federal forum—Favors Abstention.** Relevant considerations for this factor include geographical proximity of the courts and location of the parties and evidence. *See Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 650 (7th Cir. 2021) ("The convenience (or lack thereof) of the federal forum does not support abstention. The state and federal courts here are in close geographical proximity to one another and equally convenient."); *Veritas Admin., LLC v. Nowak*, No. 22 C 337, 2022 WL 17986697, at *4 (N.D. Ill. Dec. 29, 2022) (considering proximity of Joliet to Chicago and negligible difference between distance from party's location to courthouses and concluding that "[t]his factor weighs slightly in favor of abstention, if at all.").[6] The two courthouses are both within the Northern District of Illinois, most of the parties' attorneys are located in Chicago, the parties are citizens of various states and one is headquartered in Oak Brook, Illinois, and the subject property is located in Will County. This factor weights slightly in favor of abstention.

3. **The desirability of avoiding piecemeal litigation—Favors Abstention.** "The danger of piecemeal litigation does not turn on formal identity of issues but on concerns about the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority[.]" *Tyrer*, 456 F.3d at 756. Although Plaintiffs' Federal claims

---

[6] The Court respectfully declines to follow the case law cited by Plaintiffs, as the reasoning is circular, without a citation to any authority, and arguably contained in dicta within the decision. (*See* Resp. to Mot. to Stay at 18-19, Dkt. 64) (citing *Pelfresne v. Stephens*, 35 F. Supp. 2d 1064, 1074 (N.D. Ill. 1999) ("the source of governing law in the present case is federal (RICO) (factor five), and therefore the federal forum is not inconvenient (factor two) . . . [.]").

A15

encompass issues broader than those presented in the State Court Action, both cases ultimately turn on the meaning of MOU § XII.B(3). Thus, the possibility of issues being left unresolved by piecemeal litigation is not relevant here. Instead, the Court is concerned with potential of both (i) wasting two court's scarce resources by litigating the same issues in two cases at the same time and (ii) inconsistent results and the resultant effect on the public's perception of judicial legitimacy. Accordingly, this factor weighs in favor of abstention.

4. **The order in which jurisdiction was obtained by the concurrent fora—Favors Abstention.** The State Court Action was filed more than two years before this Federal case. Although Plaintiffs contend that this factor disfavors abstention because its purpose is to discourage parties from getting as second chance to litigate issues already brought by them in state court, the focus of this factor is generally which case was filed first and the time in between filings. *See, e.g., Lumen Const., Inc. v. Brant Const. Co.*, 780 F.2d 691, 697 (7th Cir. 1985) ("Of course, the state case was also filed first, nearly five months before . . .[.]"); *Goldfein v. Brown*, No. 10 C 1955, 2010 WL 5146570, at *3 (N.D. Ill. Dec. 10, 2010) ("The federal case was filed nearly two years after the state cases."). Accordingly, this factor favors abstention.

5. **The source of governing law—Favors Abstention.** The State Court Action involves application of Illinois law of contracts, police power, and other matters. The Federal case involves Federal and state antitrust law and Illinois common law. Critically, however, even the Federal claims depend largely on interpretation of MOU § XII.B(3) under Illinois law because Plaintiffs' antitrust theory depends in part on whether Defendants' interpretation of that provision is correct. To the extent the issues governed exclusively by Federal law remain after the matters of Illinois law have been determined, the Court will be able to adjudicate them. Accordingly, this factor favors abstention.

6. **The adequacy of state-court action to protect the federal plaintiff's rights—Favors Abstention.** Through various arguments made in this litigation, Defendants have all but waived any objection to Plaintiffs' ability to meaningfully participate in the State Court Action. Plaintiffs' reference to other factors in support of this one is again circular and summarily rejected by the Court. This factor weighs in favor of abstention.

7. **The relative progress of state and federal proceedings—Favors Abstention.** The State Court Action has been pending for more than two years, already gone through one appeal, a TRO hearing was held and a TRO was issued, and the parties are engaged in discovery in preparation for a preliminary injunction hearing. This Federal case was filed a little over four months ago, has not yet emerged from the pleadings stage, and no substantive relief has been entered for or against any party. This factor weights in favor of abstention.

8. **The presence or absence of concurrent jurisdiction—Disfavors Abstention.** Although Defendants concede that Plaintiffs may file affirmative defenses based on Federal antitrust law and counterclaims based on Illinois antitrust law that offers similar

16

relief as the Sherman Act in the State Court Action, it is undisputed that the Federal court has exclusive jurisdiction over affirmative Sherman Act claims. Because concurrent jurisdiction over those claims does not exist, this factor weighs against abstention.

9. **The availability of removal—Favors Abstention.** "The unavailability of removal *favors* a stay, because the purpose of this factor is to prevent litigants from circumventing the removal statute." *Loughran*, 2 F.4th at 650. It is undisputed that the State Court Action is not removable. As such, this factor weighs in favor of abstention.

10. **The vexatious or contrived nature of the federal claim—Favors Abstention.** After more than two years of litigation in the State Court Action, Plaintiffs commenced the Federal case only when the State Court Appeal and State Court TRO affected their operations. Although Plaintiffs were not named parties in that case, there is no doubt that they were closely following its development and involved with the City of Joliet's legal strategies. In addition, Defendants here have conceded that Plaintiffs could have actively participated in the matter. In light of those circumstances, the timing of the filing of this Federal case certainly suggests vexatious and contrived motivations for filing the Federal claims. Accordingly, this favor also weighs in favor of abstention.

Having considered the above factors, the Court concludes that there are exceptional circumstances warranting a stay. At its core, the dispute in both cases depends on the state court's interpretation and enforceability of MOU § XII.B(3). Given the potential of that determination to greatly narrow or eliminate the scope of issues in this case, along with the relative progress of the proceedings and other factors favoring a stay, deference to the State Court Action is appropriate. More broadly, the Court views a stay of these proceedings until the state court issues a final decision on the merits as a sensible case management tool that promotes wise judicial administration. *See GeLab.*, 99 F.4th at 428 n.1.

### III. <u>Remaining Matters</u>

Because the Court has determined that a stay pending resolution of the State Court Action is appropriate, the remaining pending motions are denied without prejudice.

A17

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion to dismiss for lack of jurisdiction [61] is denied, but their motion for a stay [48] is granted. This action is stayed pending resolution of the State Court Action. Plaintiffs' motions for a preliminary injunction [23] and expedited discovery [45] and Defendants' motion to dismiss for failure to state a claim [50] are denied without prejudice.

**DATED**: September 23, 2024                    **ENTERED**:

LaShonda A. Hunt
United States District Judge

18

A18

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS

| | |
|---|---|
| HOUBOLT ROAD EXTENSION JV, LLC, | ) |
| Plaintiff, | ) |
| | ) |
| CENTERPOINT PROPERTIES TRUST et al., | ) |
| Interested Parties/Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 22 MR 138 |
| | ) |
| The CITY OF JOLIET, | ) |
| Defendant, | ) |
| | ) |
| EAST GATE-LOGISTICS PARK et al., | ) |
| Interested Parties. | ) |

## TEMPORARY RESTRAINING ORDER

This matter comes before the Court on Plaintiff's Verified Emergency Motion for a

Temporary Restraining Order pursuant to 735 ILCS 5/11-101, notice having been given and the

Court being fully advised in the premises, the Court hereby finds that it is necessary to preserve

the status quo until a ruling on a preliminary injunction. The Court finds as follows:

## A FAIR QUESTION HAS BEEN RAISED THAT HRE HAS AN ASCERTAINABLE RIGHT IN NEED OF PROTECTION

HRE has established that there is a fair question that it has an ascertainable right in need
of protection (*HRE* ¶35; *see also* Ill. Const. Art. VII § 10(a)-(b); *Happy R Sec., LLC v. Agri-
Sources, LLC,* 2013 IL App (3d) 120509, ¶21) as follows:

      a. The MOU (Ex. 3C) is an enforceable agreement between HRE and the City and
the MOU is incorporated into a 99-year Bridge Lease (the "Bridge Lease") for the
HRE Bridge. Ex. 3B; Ex. 20A at §18.2; *see HRE* ¶35; *see also* Ex. 74 at 34;

      b. Pursuant to the MOU, HRE built a bridge over the Des Plaines river (the "HRE
Bridge") and thereby created a third route for trucks to access CenterPoint's Joliet
logistical complex (the "CNT Joliet Intermodal"). *See* Ex. 1B at 1, 90; *see also*
Ex. 3C; *HRE* ¶4. The other two access routes for trucks into the CNT Joliet
Intermodal are Laraway Road and Baseline Road (now known as Houbolt Road);
(*Complaint* ¶149);

      c. The MOU "restricts the City and County's ability to create alternative truck

A19

access points to the [CNT Joliet Intermodal] complex (*HRE* ¶8; *Complaint* ¶149);

d. HRE relied on the restrictions in the MOU as a basis for its investment of $130 million to construct the HRE Bridge (*Complaint* ¶149; *see* Ex. 3B; Ex. 20 at §18.2; Ex. 3C);

e. The covenant in Section XII(B)(3) of the MOU "prohibits, more broadly, 'steps or actions' by the City 'to eliminate trucking restrictions, weight limits, or other similar regulations" on roads that enter or exit the CNT Intermodal Center" (Ex. 3C; *HRE* ¶49); and

f. Pursuant to the Bridge Lease, HRE has a property interest in the HRE Bridge and the following land referred to as the "Bridge Parcels:" P.I.N. Nos: 06-25-301-004-0000, 06-36-100-003-0000, 06-36-301-004-0000, 06-36-300-002-0000. Ex. 20A at 58-59, 62-63. At the expiration the Bridge Lease, HRE Bridge and the Bridge Parcels "become [HRE's] property free and clear of all claims...." (Ex. 20A at §7.11.2).

## A FAIR QUESTION HAS BEEN RAISED THAT HRE
## HAS A HIGH LIKELIHOOD OF SUCCUSS ON THE MERITS

HRE has established that there is a fair question that HRE has a high likelihood of success on the merits as follows:

a. Under the City's existing Ordinance §19-21, commercial motor vehicles that exceed 20,000 pounds are prohibited from using Millsdale Road between Illinois Route 53 and the Union Pacific Railroad ("UPRR") tracks east of Brandon Road;

b. The City and East Gate-Logistics Park Chicago, LLC ("East Gate") entered into an agreement requiring that a "temporary connection" be constructed which "direct[s] truck traffic onto a section of Millsdale Road where trucks are prohibited" ("Temporary Connection") (*see* Ex. 5; Ex. 23; *HRE* ¶49);

c. The City voted to approve East Gate's subdivision plats (the "East Gate Plats") that depict the Temporary Connection at a location on Millsdale Road were trucks weighing in excess of 20,000 pounds are prohibited by Ord. §19-21 (*see* Ex. 8; Ex. 30B; *HRE* ¶49);

d. The Temporary Connection has been constructed (Ex. 63);

e. The City has plans to remove the "Weight Limit 10 Tons" sign and replace it with a sign that allows trucks "TO THIRD COAST PARKWAY" (Ex. 7028); and

f. The Interim Corporation Counsel for the City has declared that "the City shall not enforce the weight restriction ordinance [Ord. §19-21] for the section of Millsdale

A20

Road leading to [East Gate's property] until the construction of the Railroad Bridge is completed" (Ex. 5; Ex. 7029; Ex. 76 at 1:00:38-1:00:55; *HRE* ¶49).

## FAIR QUESTION HAS BEEN RAISED THAT
## THE EQUITIES WEIGH IN HRE'S FAVOR

HRE has established that there is a fair question that the City has deliberately violated covenants it made in the MOU. *See e.g.*, Exhibit 7009 at 4; Exhibit 71 at 89-93; Ex. 7028; Ex. 7029.Thus, the court is not required to "balance the equities before granting an injunction." *Reiter v. Neilis*, 125 Ill. App. 3d 774, 779-80 (3d Dist. 1984); *see also Nonnenmann v. Lucky Stores, Inc.*, 53 Ill. App. 3d 509, 515 (3d Dist. 1977); *Cordogan*, 64 Ill. App 3d at 253 (court held that *no balancing of the equities is required when "dealing ... with a restrictive covenant originated by the defendant himself"*)(emphasis added).

Furthermore, even if it balanced the equities, HRE has shown a fair question that the balancing of the equities weighs in HRE's favor as follows:

a. Ordinance Section 19-21 predated the East Gate annexation agreement by a number of years, and it is still in place and has not been modified (Ex. 7000-1; Ex. 7000A);

b. The City's agreement with East Gate expressly requires that East Gate comply with Ord. §19-21 so long as it may exist (Ex. 5);

c. Maintaining the existing sign that read "Weight Limit 10 Tons" in place merely reflects the current law (Joliet Ord. §19-21);

d. Allowing trucks weighing in excess of 20,000 pounds to use the Temporary Connection would create an alternative truck access to the CNT Joliet Intermodal Complex that would allow trucks to avoid paying tolls on the HRE Bridge, thus jeopardizing HRE's $130 million investment and funds to maintain the HRE Bridge (*Complaint* ¶¶152-53; 158); and

e. Allowing trucks weighing in excess of 20,000 pounds to use the Temporary Connection would increase truck traffic on Millsdale Road and create an increased danger to residents in the residential subdivisions located east of the UPRR tracks and motorists travelling on Millsdale Road east of the UPRR tracks. *See* Exhibit 7032.

## HRE IS NOT REQUIRED TO PROVE INJURY,
## BUT HAS RAISED A FAIR QUESTION THAT IT WILL
## SUFFER IRREPARABLE HARM

Under Illinois law, "*the mere breach of a covenant is sufficient grounds to enjoin the violation* and plaintiff is not required to show injury" and "the person in whose favor a restrictive covenant runs is *prima facie* entitled to its enforcement." *Sherwood v. Rigsby*, 221 Ill. App. 3d

A21

260, 261 (3d Dist. 1991) (emphasis added). HRE has raised a fair question that the City breached the MOU, and HRE is therefore not required to show injury. Thus, an injunction to preserve the status quo is warranted. *Id.*

However, even if Plaintiff was required to raise a fair question that HRE would be irreparably harmed by the City's "steps or actions" in violation of Section XII(B)(3) of the MOU, HRE has satisfied its burden as follows:

    a. The City's violations of Section XII(B)(3) are "transgressions of a continuing nature" and constitute irreparable harm. *See Continental Cablevision of Cook County, Inc. v. Miller,* 238 Ill. App. 3d 774, 788 (1st Dist. 1992); *Happy R Sec., LLC,* 2013 IL App (3d) 120509; and

    b. The City's actions allowing trucks weighing in excess of 20,000 pounds to use the Temporary Connection would create an alternative truck access to the CNT Joliet Intermodal Complex that would allow trucks to avoid paying tolls on the HRE Bridge, thus jeopardizing HRE's $130 million investment and funds to maintain the HRE Bridge (*Complaint* ¶¶152-53; 158).

NOW THEREFORE, IT IS HEREBY ORDERED as follows:

1. Plaintiff HRE's Verified Emergency Motion For A Temporary Restraining Order is granted without bond and until such time as this cause may be heard on Plaintiff's Verified Motion for Preliminary Injunction;

2. Prohibiting the City from taking any steps or actions to "eliminate trucking restrictions, weight limits or other similar regulations" on Millsdale Road (Ex. 3C at Sec. XII);

3. Prohibiting use of the "temporary connection" to Millsdale Road by trucks weighing in excess of 20,000 pounds (*HRE* ¶49);

4. Requiring that the City maintain in place, restore and/or re-install any weight limit and truck restriction signs on Millsdale Road to warn traffic that trucks weighing more than 20,000 pounds are prohibited on Millsdale Road between the UPRR tracks and Keith Allen Drive (Ord. §19-21);

5. Preserving the status quo, including the prohibition on the use of Millsdale Road between the UPRR tracks and Keith Allen Drive by trucks weighing in excess of 20,000 pounds which is "codified in Section 19-21 of Code of [the] Code of Ordinances City of Joliet," until the Court issues a ruling on HRE's motion for preliminary injunction (*id.*; Ex. 74 at 19); and

6. Status on Plaintiff's Verified Motion for Preliminary Injunction is set for _April 5_ , 2024 at _10:00_ .

A22

_____
JUDGE

_____
March 19, 2024
DATE

John M. Spesia – 6216893
Chris G. Spesia – 6226155
Jacob E. Gancarczyk – 6309049
Michelle M. Kavanaugh – 6346048
Spesia & Taylor
1415 Black Road
Joliet, IL 60435
(815) 726-4311
jspesia@spesia-taylor.com
cspesia@spesia-taylor.com
jgancarczyk@spesia-taylor.com
mkavanaugh@spesia-taylor.com

5

A23

# MEMORANDUM OF UNDERSTANDING
## FOR THE HOUBOLT ROAD PROJECT
### BETWEEN THE ILLINOIS DEPARTMENT OF TRANSPORTATION, THE COUNTY OF WILL, THE CITY OF JOLIET, AND CENTERPOINT PROPERTIES TRUST

This MEMORANDUM OF UNDERSTANDING (hereinafter referred to as the "MOU") is entered this 19th day of December AD, 2016, by and between THE STATE OF ILLINOIS, acting by and through its DEPARTMENT OF TRANSPORTATION (hereinafter referred to as the "DEPARTMENT"), THE COUNTY OF WILL, acting by and through its WILL COUNTY DIVISION OF TRANSPORTATION (hereinafter referred to as the "COUNTY"), the CITY OF JOLIET (hereinafter referred to as the "CITY"), and CENTERPOINT PROPERTIES TRUST (hereinafter referred to as "CNT"), (collectively referred to as the "PARTIES" and individually referred to as a "PARTY").

WHEREAS, the PARTIES, to facilitate the efficient flow of traffic and to further the safety of the motoring public, are interested in making roadway improvements to Houbolt Road from and including the I-80/Houbolt Road Interchange and the US-6/Houbolt Road Intersection by completing construction, reconstruction, widening, and resurfacing work; and

WHEREAS, CNT, the CITY, and the COUNTY, to facilitate the efficient flow of traffic and to further the safety of the motoring public, are interested in extending Houbolt Road between US-6 and Schweitzer Road by constructing a bridge over the Des Plaines River; and

WHEREAS, the purpose of such roadway improvements is to promote public safety, reduce traffic congestion on local and state roads, preserve road surfaces, accelerate economic development for the benefit of the entire region, create new jobs, and accelerate the timing of infrastructure upgrades that serve the public interest by capturing both public and private funding sources; and

WHEREAS, this MOU will serve to preliminarily identify and define the rights and responsibilities of the PARTIES regarding the financing, development, construction, operation, and maintenance of certain roadway improvements; and

WHEREAS, this MOU may also serve as the basis for future agreements between individual PARTIES to further define their rights and responsibilities regarding financing, operations, maintenance, and other items; and

WHEREAS, the DEPARTMENT, by virtue of its powers as set forth in the Illinois Highway Code, 605 ILCS 5/101 *et seq.*, is authorized to enter into this MOU; and

WHEREAS, the COUNTY, by virtue of its powers as set forth in the Illinois Counties Code, 55 ILCS 5/1-1001 *et seq.*, is authorized to enter into this MOU; and

WHEREAS, the CITY, by virtue of its powers as set forth in the Illinois Municipal Code, 65 ILCS 5/1-1-1 *et seq.*, and its status as a home rule municipality as described in Article VII, Section 6(a) of the Illinois Constitution of 1970, is authorized to enter into this MOU; and

WHEREAS, CNT by virtue of its status as a private entity, has the ability to contract with public sector entities to assist with infrastructure upgrades that serve the public interest.

1

A24

NOW, THEREFORE, be it resolved that the PARTIES hereby agree as follows:

## I. PROJECT ELEMENTS / TERMS IN THIS MOU

A. As used in this MOU, the term "BRIDGE" or "BRIDGE PROJECT" means the extension of Houbolt Road between US-6 and Schweitzer Road by constructing a bridge over the Des Plaines River.

B. As used in this MOU, the term "IMPROVEMENTS NORTH OF US-6" includes the following project elements:

  i. Improvements to the I-80/Houbolt Road Interchange, which shall include construction, reconstruction, widening, and resurfacing work;

  ii. Improvements to the US-6/Houbolt Road Intersection, which shall include construction, reconstruction, widening, and resurfacing work;

  iii. Improvements to Houbolt Road between I-80 and US-6, which shall include widening and resurfacing work; and

  iv. Improvements to the Railroad Crossing surface and signals (if applicable) on Houbolt Road between I-80 and US-6.

C. As used in this MOU, the term "HOUBOLT ROAD PROJECT" includes the BRIDGE PROJECT and the IMPROVEMENTS NORTH OF US-6.

## II. STATEMENTS OF OVERALL RESPONSIBILITY

A. The CITY, at its sole cost and expense but subject to its right to reimbursement from the DEPARTMENT under Section VIII of this MOU, will assume overall responsibility for the IMPROVEMENTS NORTH OF US-6, including the engineering, permitting, construction, and operation of the IMPROVEMENTS NORTH OF US-6, with such rights and responsibilities as defined in this MOU and as may be further defined in one or more later agreements between some or all of the PARTIES.

B. CNT will assume overall responsibility for the BRIDGE, including the engineering, permitting, and construction of the BRIDGE, with such rights and responsibilities as defined in this MOU and as may be further defined in one or more later agreements between some or all PARTIES. As described in Section IX of this MOU, CNT will be the developer of the BRIDGE, and the PARTIES presently anticipate that CNT will finance, own in fee, and operate the BRIDGE.

C. A PARTY may retain third parties, such as contractors, in connection with that PARTY'S responsibilities under this MOU.

## III. GENERAL PERMITTING AND APPROVAL OBLIGATIONS

A25

A. The PARTIES will use commercially reasonable efforts to collectively secure all permits and approvals, necessary to complete the HOUBOLT ROAD PROJECT, and in accordance with project schedules and deadlines to be established and agreed upon by the respective PARTIES.

B. Upon full compliance with all relevant laws, rules, regulations and requirements, the DEPARTMENT, CITY, and COUNTY will issue all permits and/or pass ordinances for all components of the HOUBOLT ROAD PROJECT under their respective jurisdictions.

## IV. ENVIRONMENTAL, HIGHWAY, & UTILITY PERMITTING

A. Subject to the obligation of the PARTIES to use commercially reasonable efforts to collectively secure all permits and approvals in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES pursuant to Sections V, VI, and VII of this MOU,

    i. CNT will be primarily responsible for securing all environmental permits required for the BRIDGE PROJECT, and the CITY will be primarily responsible for securing all environmental permits required for the IMPROVEMENTS NORTH OF US-6. CNT will be primarily responsible for securing joint participation and/or force account agreements (*e.g.*, county, township, municipal, railroad, utility) required for the BRIDGE, and the CITY will be primarily responsible for securing such agreements for the IMPROVEMENTS NORTH OF US-6.

    ii. To the extent that any permitting agency considers the BRIDGE PROJECT and the IMPROVEMENTS NORTH OF US-6 to be a "single and complete project" for purposes of permit issuance, CNT and the CITY will use commercially reasonable efforts to collectively secure the permit.

    iii. The DEPARTMENT will issue to the CNT and/or its contractors all highway permits for components of the BRIDGE PROJECT under its jurisdiction, and the DEPARTMENT will issue to the CITY and/or its contractors all highway permits for components of the IMPROVEMENTS NORTH OF US-6 under its jurisdiction, including those related to CNT or CITY access, crossings, staging areas, and other construction activities.

    iv. The DEPARTMENT and CITY will issue and/or obtain all permits necessary for the construction, reconstruction, relocation, or modification of utility facilities located on or within DEPARTMENT and CITY rights of way for the IMPROVEMENTS NORTH OF US-6 at no expense to other PARTIES.

    v. CNT will use commercially reasonable efforts to obtain all permits necessary for the construction, reconstruction, relocation, or modification of utility facilities located on or within rights of way for the BRIDGE PROJECT. If the DEPARTMENT, CITY, or COUNTY control such rights of way, then the DEPARTMENT, CITY, or COUNTY will issue the necessary permit, within their authority, to CNT at no cost.

## V. ENGINEERING WORK

A26

A. For the IMPROVEMENTS NORTH OF US-6, the CITY will perform or obtain preliminary and final design engineering, necessary surveys, and final plans and specifications, and administer the construction in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES. The DEPARTMENT will share with the CITY, and allow the CITY to use and rely upon, design engineering studies and other materials related to the IMPROVEMENTS NORTH OF US-6 prepared by or at the request of the DEPARTMENT, including, without limitation, with the I-80/Houbolt Road Interchange and US-6/Houbolt Road Intersection Design Studies.

B. For the BRIDGE, CNT will perform or obtain preliminary and final design engineering, obtain necessary surveys, and prepare the final plans and specifications, and administer the construction in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES.

C. The CITY will submit to the DEPARTMENT for its approval preliminary and final design plans for the IMPROVEMENTS NORTH OF US-6, and CNT will submit to the DEPARTMENT for its approval of the structural adequacy of the BRIDGE the preliminary and final design plans for the BRIDGE. The DEPARTMENT will approve or disapprove of such plans within 30 days from the DEPARTMENT's receipt thereof. All plans shall be in accordance with the DEPARTMENT's Standard Specifications for Road and Bridge Construction or other, applicable standards. No changes shall be made on any approved plans, specifications, or special provisions by any PARTY without the consent of the DEPARTMENT, which consent shall not be unreasonably withheld, conditioned, or delayed.

## VI. RIGHTS OF WAY / PROPERTY RIGHTS

A. The CITY will perform all survey work and prepare all parcel plats and legal descriptions for all rights of way, both permanent and temporary, necessary for the construction of the IMPROVEMENTS NORTH OF US-6 pursuant to the final plans and specifications and in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES.

B. CNT will perform all survey work and prepare all parcel plats and legal descriptions for all rights of way, both permanent and temporary, necessary for the construction of the BRIDGE pursuant to the final plans and specifications and in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES.

C. CNT will use commercially reasonable efforts, in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES, to acquire property rights necessary to complete the BRIDGE, provided such property rights are not already held by the DEPARTMENT, COUNTY, CITY, or CNT. If the DEPARTMENT, COUNTY, or CITY holds such property rights, the DEPARTMENT, COUNTY, or CITY will issue the necessary permits, within their authority or negotiate and execute with CNT an easement agreement or other similar agreement that gives CNT sufficient property rights to construct, operate, and maintain the BRIDGE. If such property rights are held by a third party, and CNT is unable, after using commercially reasonable efforts to acquire such rights, then the CITY, the COUNTY, and CNT shall confer as soon as practicable regarding the exercise of eminent domain authority by the CITY or the COUNTY to condemn such rights.

## VII. PROCUREMENT / CONSTRUCTION

A. For construction of the IMPROVEMENTS NORTH OF US-6 to be funded wholly or partially by the DEPARTMENT, the CITY or their agents will advertise and receive bids, and will submit to the DEPARTMENT the amount of such bids. The DEPARTMENT will approve or disapprove the amount of the bids within 60 days from the DEPARTMENT's receipt thereof. Once approved, the CITY will award the contract(s), inspect the work's construction and engineering, and construct the IMPROVEMENTS NORTH OF US-6 in accordance with the plans and specifications approved by the DEPARTMENT under Section V of this MOU. The IMPROVEMENTS NORTH OF US-6 shall be designed and constructed in accordance with the DEPARTMENT's Standard Specifications for Road and Bridge Construction or other, applicable standards, and in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES. Reimbursement paid by the DEPARTMENT to the CITY for construction of the IMPROVEMENTS NORTH OF US-6 will be formalized in a separate reimbursable agreement and based upon terms and provisions of Section VIII of this MOU. The DEPARTMENT shall have the right to access and inspect any construction related to the IMPROVEMENTS NORTH OF US-6.

B. For construction of the BRIDGE, CNT or its agents will advertise and receive bids, award the contract(s), inspect the work's construction and engineering, and construct the BRIDGE in accordance with the plans and specifications approved by the DEPARTMENT under Section V of this MOU. The BRIDGE shall be designed and constructed in accordance with the DEPARTMENT's Standard Specifications for Road and Bridge Construction or other, applicable standards, and in accordance with project schedules and deadlines to be established and agreed upon by the PARTIES.

## VIII. DEPARTMENT FUNDING FOR THE IMPROVEMENTS NORTH OF US-6

A. Subject to Sections VIII(C) and VIII(D) of this MOU, the DEPARTMENT will reimburse the CITY for all approved work, including preliminary and final design engineering, surveying work, right of way acquisition along US-6, and construction, related to the IMPROVEMENTS NORTH OF US-6. The DEPARTMENT's standard division of costs for construction will apply.

B. The CITY will seek approval from the DEPARTMENT prior to performing any work for which the DEPARTMENT will be obligated to reimburse the CITY. The DEPARTMENT agrees to expedite such approvals so as not to impede progress with the associated engineering, surveying, construction, or other work.

C. The DEPARTMENT's only monetary contribution under this MOU will be for IMPROVEMENTS NORTH OF US-6, and shall not exceed $21,000,000. The DEPARTMENT, upon formal execution of a reimbursable agreement between DEPARTMENT and CITY will obligate funds in State Fiscal Year 2017, which runs from July 1, 2016 through June 30, 2017. Upon execution a reimbursable agreement between the DEPARTMENT and the CITY, and upon receipt of an invoice from the CITY, the DEPARTMENT agrees to pay the CITY 10% of the DEPARTMENT's monetary contribution ($2,100,000) for engineering costs associated with the IMPROVEMENTS NORTH OF US-6. Upon letting of the construction contract and approval of the apparent low bidder by the DEPARTMENT and upon receipt of an invoice from the CITY, the DEPARTMENT agrees to

pay to the CITY an amount equal to at least 75% of the as bid construction costs for the IMPROVEMENTS NORTH OF US-6 as bid by the apparent low bidder. Upon completion of the IMPROVEMENTS NORTH OF US-6 and receipt of an invoice by the CITY, the DEPARTMENT shall pay to the CITY the remaining balance of actual construction and engineering costs associated with the IMPROVEMENTS NORTH OF US-6 up to the maximum monetary contribution of $21,000,000. Following a public announcement of the HOUBOLT ROAD PROJECT, the DEPARTMENT will include the IMPROVEMENTS NORTH OF US-6 in the DEPARTMENT's Improvements for Illinois Highways for State Fiscal Year 2017. If the DEPARTMENT publishes the Improvements for Illinois Highways for State Fiscal Year 2017 prior to a public announcement of the HOUBOLT ROAD PROJECT, then the DEPARTMENT shall revise the Improvements for Illinois Highways for State Fiscal Year 2017 document to include the IMPROVEMENTS NORTH OF US-6.

D. The DEPARTMENT's financial obligations under this MOU are contingent upon and subject to the availability of sufficient funds. The DEPARTMENT may terminate or suspend its reimbursement obligations under this Section (VIII), in whole or in part, without penalty or further payment being required, if (i) sufficient State funds have not been appropriated to the DEPARTMENT, (ii) the Governor or the DEPARTMENT reserves appropriated funds, or (iii) the Governor or the DEPARTMENT determines that appropriated funds are not available for payment. The DEPARTMENT shall provide notice, in writing, to the CITY, COUNTY, and CNT of any such funding failure and the DEPARTMENT's election to terminate or suspend its responsibilities and obligations under this MOU as soon as practicable. Any suspension or termination pursuant to this Section VIII(D) will be effective upon the receipt of such notice by the DEPARTMENT, the COUNTY, and CNT. However, as soon as the DEPARTMENT becomes aware that it may be unable to satisfy its reimbursement obligations under this Section (VIII), and before the DEPARTMENT exercises its right to terminate or suspend such reimbursement obligations and provides notice thereof, the DEPARTMENT must meet and confer with the CITY, COUNTY, and CNT as early as practically possible. At that meet and confer session, the PARTIES will discuss, at a minimum, alternative funding sources to satisfy the DEPARTMENT's reimbursement obligations under this Section (VIII).

E. The CITY or it agent(s) will not proceed to construction of the IMPROVEMENTS NORTH OF US-6 until CNT or its agents have commenced construction of the BRIDGE PROJECT.

## IX. THE BRIDGE PROJECT

A. Subject to Sections IX(G), IX(H), and IX(I) of this MOU, CNT will be the developer of the BRIDGE, and will be responsible for the construction, engineering, and permitting of the BRIDGE, with such rights and responsibilities to be further defined in one or more later agreements between some or all PARTIES.

B. Subject to Sections IX(G), IX(H), and IX(I) of this MOU, CNT will finance the BRIDGE and will provide or source the funding for the BRIDGE.

C. Subject to Sections IX(G), IX(H), and IX(I) of this MOU, CNT will be the fee owner and operator of the BRIDGE. However, CNT shall have the right to sell or assign its fee ownership to third parties.

A29

D. The PARTIES will investigate and define a mutually beneficial ownership and operation structure for the BRIDGE which may include, without limitation, CNT fee ownership of the BRIDGE, or CITY ownership and lease of the BRIDGE, under which CNT shall have the right to operate the BRIDGE and impose tolls. Such ownership and operation structure shall be defined in one or more later agreements between some or all of the PARTIES.

E. The PARTIES presently anticipate that the BRIDGE will be permitted under the Illinois Toll Bridge Act, 605 ILCS 115/0.01, *et seq.* As such, the COUNTY expects to authorize the establishment and erection of the BRIDGE under 605 ILCS 115/2. The CITY, COUNTY, and CNT will take all reasonable steps to ensure that CNT can impose toll rates sufficient to support full funding of the BRIDGE, which may include, without limitation, a tolling agreement between the COUNTY and CNT establishing a maximum and minimum toll rate schedule. CNT may enter into a Letter or Memorandum of Understanding or other agreement with the DEPARTMENT, CITY, or COUNTY describing any sharing of toll collections from the BRIDGE.

F. Nothing in this MOU prevents the CITY and CNT from executing a Letter or Memoranda of Understanding or another agreement to further define their rights and responsibilities regarding engineering and construction work for the IMPROVEMENTS NORTH OF US-6 and maintenance responsibilities for the BRIDGE.

G. Notwithstanding any provision of this MOU to the contrary, the DEPARTMENT, CITY, and COUNTY agree that CNT's participation in the HOUBOLT ROAD PROJECT, and CNT's satisfaction of any responsibility or obligation under this MOU, is contingent upon CNT receiving (1) the necessary CNT internal approvals and (2) appropriate commitments from the DEPARTMENT, CITY, and COUNTY to indicate a reliable basis to proceed with the HOUBOLT ROAD PROJECT. If CNT does not receive such internal approvals or appropriate commitments, CNT may terminate or suspend its responsibilities and obligations under this MOU, in whole or in part, without penalty or further payment. If CNT elects to terminate or suspend its responsibilities and obligations under this MOU, CNT shall provide notice, in writing, to the DEPARTMENT, CITY, and COUNTY of CNT's election as soon as practicable, and such suspension or termination will be effective upon the receipt of such notice by the DEPARTMENT, CITY, and COUNTY. However, as soon as CNT becomes aware that it may seek to terminate or suspend responsibilities and obligations under this MOU, and before CNT exercises its right to terminate or suspend such responsibilities and obligations and provides notice thereof, CNT must meet and confer with the DEPARTMENT, CITY and COUNTY as early as practically possible.

H. Notwithstanding any provision of this MOU to the contrary, any PARTY has the right to opt out of the HOUBOLT ROAD PROJECT at any time during the Due Diligence Period for any reason, or at any time after the Due Diligence Period if any other PARTY is unable to timely obtain or issue, or refuses or retracts the issuance of, the necessary project permits, approvals, or financing. For purposes of this Section IX(H), the "Due Diligence Period" means the period starting on the effective date of this MOU and ending on the date on which initial funding of the IMPROVEMENTS NORTH OF US-6 and the BRIDGE are complete.

I. Notwithstanding any provision of this MOU to the contrary, CNT has the right to opt out of the HOUBOLT ROAD PROJECT on or before August 31, 2017 if CNT understands, after

A30

reasonable investigation, that the DEPARTMENT has not obligated funds during State Fiscal Year 2017 for its contribution to the IMPROVEMENTS NORTH OF US-6 under Section VIII of this MOU.

## X. MAINTENANCE OF EXISTING FACILITIES

A. The PARTIES will continue to maintain their existing facilities consistent with existing maintenance agreements, unless otherwise agreed to in one or more later agreements between the PARTIES.

## XI. COOPERATION AND PUBLIC STATEMENTS

A. With regard to the development of the BRIDGE, which is separate and distinct from the financing of the BRIDGE, the PARTIES cannot bring new parties into the HOUBOLT ROAD PROJECT without agreement in writing from all PARTIES.

    i. This means, without limitation, that the DEPARTMENT, CITY, and COUNTY shall take no steps or actions to replace CNT as the developer of the BRIDGE unless CNT has opted out of the HOUBOLT ROAD PROJECT.

B. If, prior to a public announcement regarding the HOUBOLT ROAD PROJECT, a PARTY intends to make a public statement regarding the HOUBOLT ROAD PROJECT, including, without limitation, a statement in response to a request for information (*e.g.,* a media inquiry) or a statement to be made at the PARTY's own initiative (*e.g.*, holding a press conference), that PARTY shall notify the other PARTIES of its intentions prior to making any such statement. The PARTY shall confer as soon as practicable and prior to any such statement being made regarding, at a minimum, the accuracy of the planned statement and the potential impact of such statement on the HOUBOLT ROAD PROJECT and the PARTIES.

## XII. FLOW OF TRAFFIC

A. In order to promote public safety, facilitate the efficient flow of traffic, preserve road surfaces, and ensure other HOUBOLT ROAD PROJECT objectives are satisfied, the CITY, COUNTY, and CNT agree to investigate whether they should define, establish, and enforce additional non-truck routes within or adjacent to the CNT Intermodal Center, with such investigation starting on the one year anniversary of the date on which the BRIDGE becomes operational.

B. The CITY and COUNTY agree that they will take no steps or actions to (1) eliminate CNT's authority to impose tolls and place restrictions on North CenterPoint Way; (2) build new roads adjacent to the CNT Intermodal Center on which trucks may travel or build new roads that enter or exit the CNT Intermodal Center on which trucks may travel; and (3) eliminate trucking restrictions, weight limits, or other similar regulations on roads that enter or exit the CNT Intermodal Center or on roads that are adjacent to the CNT Intermodal Center.

   i.  For existing roads adjacent to the CNT Intermodal Center on which trucks may travel as of the effective date of this MOU, this Article XII(B) shall not prevent the CITY or COUNTY from increasing or decreasing weight limits on such roads in a manner consistent with amendments to the Illinois Vehicle Code, 625 ILCS 5/15-100, *et seq.*

   ii. For existing roads adjacent to the CNT Intermodal Center, if the DEPARTMENT intends to assume jurisdiction over roads under CITY or COUNTY jurisdiction, or the CITY or COUNTY intends to transfer jurisdiction to the DEPARTMENT, the DEPARTMENT or the CITY or COUNTY shall notify CNT of its intent. CNT shall have the right of first refusal to assume jurisdiction over the existing road. The DEPARTMENT and the CITY or COUNTY must then meet and confer with CNT as soon as practically possible to discuss, at a minimum, the following concerning any intended jurisdictional transfer: (1) its necessity; (2) the purpose and public need to be addressed through the proposed action (*i.e.*, protection and/or enhancement of public safety through congestion reduction); and (3) any risk to the fiscal sustainability of the BRIDGE. After the meet and confer process has concluded, CNT shall have 60 days to inform the CITY or COUNTY whether it will exercise its right of first refusal to assume jurisdiction over the existing road. If CNT so notifies the CITY or COUNTY, the CITY or COUNTY and CNT shall commence good faith negotiations for a period not to exceed 120 days from the date on which the CITY or COUNTY received CNT's notice to finalize a written agreement governing the jurisdictional transfer of existing roads to CNT, as permissible by State law. The 120-day period may be extended by mutual agreement of the CITY or COUNTY and CNT. For all roads that CNT assumes jurisdiction over pursuant this Section XII(B), CNT shall own such roads and shall have the right, subject to the requirement that CNT meet the purpose and need identified by the PARTIES during the meet and confer session, to impose (1) tolls or charges on vehicles for the privilege of using such roads and (2) trucking restrictions, weight limits, or other similar regulations on such roads.

C. In order to ensure that the BRIDGE remains a fiscally sustainable long-term traffic solution that serves to protect and enhance public safety, the DEPARTMENT agrees that, prior to taking steps or actions to (1) build new roads adjacent to the CNT Intermodal Center or (2) change trucking restrictions, weight limits, or similar regulations for roads adjacent to the CNT Intermodal Center and construct any related improvements to roads adjacent to the CNT

9

A32

Intermodal Center, the DEPARTMENT must notify CNT of its intent. CNT shall have the right of first refusal to assume jurisdiction over the new or existing road, as permissible by State law. The DEPARTMENT must then meet and confer with CNT as soon as practically possible to discuss, at a minimum, the following concerning any proposed road construction or regulatory change: (1) its necessity; (2) the purpose and public need to be addressed through the proposed action (*i.e.*, protection and/or enhancement of public safety through congestion reduction); and (3) any risk to the fiscal sustainability of the BRIDGE. After the meet and confer process has concluded, CNT shall have 60 days to inform the DEPARTMENT whether it will exercise its right of first refusal to assume jurisdiction over the road at issue, as permissible by State law. If CNT so notifies the DEPARTMENT, the DEPARTMENT, CNT and, if necessary, the CITY or COUNTY shall commence good faith negotiations for a period not to exceed 120 days from the date on which CNT received the DEPARTMENT's notice to finalize a written agreement outlining the process by which jurisdiction over the subject road(s) will be transferred to CNT, as permissible by State law. The 120-day period may be extended by mutual agreement of the DEPARTMENT and CNT and, if applicable, the CITY or COUNTY. The written agreement shall cover (1) ways in which the PARTIES will minimize risk to the fiscal sustainability of the BRIDGE, (2) CNT's ability to impose trucking restrictions, weight limits, or other similar regulations on the road(s), (3) CNT's ability to impose tolls or charges on vehicles for the privilege of using such roads, (4) monetary compensation to the DEPARTMENT, CITY or COUNTY for the jurisdictional transfer, (5) potential revenue sharing opportunities for the PARTIES, should CNT seek to toll the road subject to jurisdictional transfer, and (6) what, if any, additional written agreement(s) with the CITY or COUNTY is necessary to effectuate the transfer. Nothing in this Section XII(C) shall limit the DEPARTMENT's ability to repair or perform emergency work on I-80, Illinois 53, I-55, US-6, or Arsenal/Manhattan Road from I-55 to Baseline Road.

D. For purposes of this Section XII, "adjacent to the CNT Intermodal Center" means all territory within the area depicted in Exhibit A to this MOU as the "Study Area."

E. Nothing in this MOU shall limit the DEPARTMENT's ability to perform widening, resurfacing, or related improvement work on I-80, Illinois 53, I-55, US-6, or Arsenal/Manhattan Road from I-55 to Baseline Road.

F. Nothing in this MOU shall limit the COUNTY's ability to perform widening, resurfacing, or related improvement work on any road adjacent to the CNT Intermodal Center and under COUNTY jurisdiction. However, in no event shall the COUNTY improve Arsenal/Manhattan Road from Baseline Road to Illinois 53 so as to legally permit truck traffic.

G. Nothing in this MOU shall limit the CITY's ability to perform widening, resurfacing, or related improvement work on any road adjacent to the CNT Intermodal Center and under CITY jurisdiction. However, in no event shall the CITY improve Millsdale Road between Illinois 53 and the railroad tracks east of Brandon Road or Schweitzer Road between Illinois 53 and Brandon Road so as to legally permit truck traffic.

## XIII. INTERGOVERNMENTAL AGREEMENTS

A33

A. The DEPARTMENT and the CITY may execute Intergovernmental Agreements regarding the sharing of costs for the IMPROVEMENTS NORTH OF US-6 and to further define the rights and responsibilities of the DEPARTMENT and the CITY regarding the same. However, prior to executing any such agreement that could affect the rights and obligations of the COUNTY or CNT under this MOU or the HOUBOLT ROAD PROJECT, the DEPARTMENT and the CITY shall provide the COUNTY and CNT with a copy of the agreement and a reasonable opportunity to assess its impact upon the HOUBOLT ROAD PROJECT and the COUNTY or CNT, and to propose reasonable modifications.

B. The CITY may execute Intergovernmental Agreements and Letters or Memoranda of Understanding with federal and state agencies other than the DEPARTMENT or the COUNTY that have requested that additional projects or work be completed as part of the IMPROVEMENTS NORTH OF US-6. However, prior to executing any such agreement, letter, or memorandum that could affect the rights and obligations of the DEPARTMENT, COUNTY, or CNT under this MOU or the HOUBOLT ROAD PROJECT, the CITY shall provide the DEPARTMENT, COUNTY, and CNT with a copy of the agreement, letter, or memorandum and a reasonable opportunity to assess its impact upon the HOUBOLT ROAD PROJECT and the DEPARTMENT, COUNTY, or CNT, and to propose reasonable modifications.

C. In State Fiscal Year 2017 or at an earlier time if appropriate, the DEPARTMENT and the CITY may execute an Intergovernmental Agreement regarding DEPARTMENT financial assistance to the CITY for engineering work and final construction of the IMPROVEMENTS NORTH OF US-6. Any such commitments shall be subject to the limitations articulated in Section VIII(D).

## XIV. CONFIDENTIALITY

A. The provisions of the March 3, 2016 Non-Disclosure Agreement executed by the DEPARTMENT and CNT are incorporated herein by reference in their entirety and made a part of this MOU.

B. The PARTIES shall execute a Non-Disclosure Agreement similar to the March 3, 2016 Non-Disclosure Agreement executed by the DEPARTMENT and CNT to address the exchange of confidential information regarding the HOUBOLT ROAD PROJECT. If any PARTY has not executed such an agreement prior to the execution of this MOU, they shall do so as soon as practicable.

## XV. ASSIGNMENT

A. CNT may not assign its rights and responsibilities under this MOU without the consent of the other PARTIES, which consent shall not be unreasonably withheld, conditioned, or delayed. However, CNT may assign its rights and responsibilities under this MOU to a legal entity under the common control of CNT without the consent of the other PARTIES.

A34

## XVI.  TERM

A. This MOU shall be effective upon execution and shall not continue beyond forty (40) years from the date of execution.  The expiration of this MOU does not impact any terms or durations of any other agreements and/or letters or memoranda of understanding between the PARTIES related to the HOUBOLT ROAD PROJECT.


## XVII. MISCELLANEOUS

A. Severability.  If any term of this MOU is to any extent invalid, illegal, or incapable of being enforced, such term shall be excluded to the extent of such invalidity, illegality, or unenforceability; all other terms hereof shall remain in full force and effect.

B. No Remuneration.  Except as provided in this MOU, no PARTY shall be entitled to compensation from another PARTY by way of salary, overhead, or otherwise for time and/or efforts expended pursuant to this MOU or in furtherance of the HOUBOLT ROAD PROJECT.

C. No Individual Authority.  Except as provided in this MOU, or unless delegated or authorized in accordance with this MOU, no PARTY has any authority to act for, or undertake or assume any obligations or responsibility on behalf of any other PARTY.  Each PARTY agrees to be responsible for any and all claims, losses, costs (including attorneys' and professional fees in reasonable amounts) liabilities, damages, fines, and penalties (collectively, "Claims") arising out of or in connection with such PARTY's unauthorized actions.

D. No One Responsible for Others' Commitments.  Except as provided in this MOU, no PARTY shall be responsible or liable for any obligation of any other PARTY incurred either before or after the execution of this MOU, other than those joint responsibilities or liabilities undertaken in accordance with this MOU or any other agreement relating to the HOUBOLT ROAD PROJECT that the PARTIES may separately authorize or execute.

E. No Partnership or Joint Venture.  The PARTIES are neither legal partners nor joint venturers, and this MOU does not create the legal relation of partners or joint venturers among or between the PARTIES. Each PARTY is acting independently, is obligated to separately account for its respective activities for tax and other purposes, and expressly disclaims any fiduciary duty to the others.

F. Amendments. Except as provided in this MOU, this MOU may not be amended without unanimous consent of the PARTIES.

G. Notices.  Any notice, consent, or approval given hereunder shall be sent to the representatives identified herein (1) by e-mail and by deposit in the United States mail, certified mail first class delivery return receipt requested, or (2) by personal delivery.  The representatives and/or addresses set forth herein may be changed at any time by any PARTY by written notice to the other PARTIES.


For the DEPARTMENT:          Jennifer Kuntz
                             Illinois Department of Transportation

A35

2300 South Dirksen Parkway
Springfield, Illinois 62764
Jennifer.Kuntz@illinois.gov

With a copy to:

William Barnes
Chief Counsel
Illinois Department of Transportation
100 West Randolph, Suite 6-600
Chicago, Illinois 60601
William.M.Barnes@illinois.gov

For CNT:     Rick Mathews
CenterPoint Properties
1808 Swift Drive
Oak Brook, Illinois 60523
rmathews@centerpoint.com

With copies to:

Brian Sheehan
CenterPoint Properties
1808 Swift Drive
Oak Brook, Illinois 60523
bpsheehan@centerpoint.com

Jeremy Grey
CenterPoint Properties
1808 Swift Drive
Oak Brook, Illinois 60523
jgrey@centerpoint.com

Adam Margolin
Quarles & Brady LLP
300 North LaSalle Street, Suite 4000
Chicago, Illinois 60654
adam.margolin@quarles.com

For the CITY:    Jim Hock
150 W. Jefferson Street
Joliet, Illinois 60432

A36

jhock@jolietcity.org

With a copy to:

Jim Trizna
150 W. Jefferson Street
Joliet, Illinois 60432
jtrizna@jolietcity.org

For the COUNTY:                    Nick Palmer
                                   302 N. Chicago Street
                                   Joliet, Illinois 60432
                                   npalmer@willcountyillinois.com

                                   With copies to:

                                   Bruce Gould
                                   16841 W. Laraway Road
                                   Joliet, Illinois 60433
                                   BGould@willcountyillinois.com

                                   Mary Tatroe
                                   Office of the Will County State's Attorney
                                   57 N. Ottawa Street
                                   Joliet, Illinois 60433
                                   MTatroe@willcountyillinois.com

A37

IN WITNESS THEREOF, the ILLINOIS DEPARTMENT OF TRANSPORTATION, the COUNTY OF WILL, the CITY OF JOLIET, and CENTERPOINT PROPERTIES TRUST have caused this instrument to be duly executed on the day and year first written above.

**THE CITY OF JOLIET**

By: *Bob O'Delirk*

BOB O'DELIRK
(Please Print Name)

Date: 11/14/16

Attest: *Christa M. Desiderio*

Christa M. Desiderio
(Please Print Name)

**THE COUNTY OF WILL**

By: *Lawrence M. Walsh*

Lawrence M Walsh
(Please Print Name)

Date: November 16, 2016

Attest: *Nancy Schultz Voots*

Nancy Schultz Voots
(Please Print Name)

**CENTERPOINT PROPERTIES TRUST**

By: *Michael P. Murphy*

Michael P. Murphy
Chief Development Officer
(Please Print Name)

Date: 11-14-16

Attest: *Michelle M. Metes*

MICHELLE M. METES
(Please Print Name)

By: *Michael Tortorici*

Michael Tortorici
Senior Vice President, Treasurer
(Please Print Name)

Date: 11-14-16

Attest: *Michelle M. Metes*

MICHELLE M. METES
(Please Print Name)

15

A38

# STATE OF ILLINOIS, DEPARTMENT OF TRANSPORTATION

By: _____   Attest: _____

Randall Blankenhorn, Secretary

SARAH KUIMANN

(Please Print Name)

Date: ____12/15/16____


By: _____   Attest: _____

Jeff Heck, Chief Fiscal Officer
Director of Finance and Administration

SARAH KUIMANN

(Please Print Name)

Date: ____12/15/16____


By: _____   Attest: _____

Priscilla A. Tobias
Director, Office of Program Development

Sarah KUIMANN

(Please Print Name)

Date: ____12/15/16____


By: _____   Attest: _____

William M. Barnes, Chief Counsel

Sarah KUIMANN

(Please Print Name)

Date: ____12/15/16____

A39



STUDY
AREA

PROPOSED
4 LANE
APPROACH
ROADWAY

MAJOR RIVER BRIDGE

PROPOSED
4 LANE
APPROACH
ROADWAY

JOLIET
INTERMODAL
TERMINAL

AUTOBAHN
COUNTRY
CLUB

CENTERPOINT
INTERMODAL
CENTER
NORTH

CENTERPOINT
INTERMODAL
CENTER

BNSF
LOGISTICS
PARK
CHICAGO

NOTE:

VILLAGE OF ELWOOD ROADS IN REGARD TO
SECTION XII OF THE MOU DO NOT APPLY

LEGEND

PROPOSED
ROADWAY
IMPROVEMENTS

PROPOSED
STRUCTURE

STUDY AREA

EXHIBIT A

A40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EAST GATE-LOGISTICS PARK          )
CHICAGO, LLC, and NORTHPOINT      )
DEVELOPMENT, LLC,                 )
                                  )
                Plaintiffs,       )
                                  )
     -vs-                         )   Case No. 24 C 3742
                                  )
CENTERPOINT PROPERTIES            )
TRUST; CENTERPOINT JOLIET         )
TERMINAL RAILROAD, LLC; and,      )
HOUBOLT ROAD EXTENSION JV, LLC,   )   Chicago, Illinois
                                  )   August 30, 2024
                Defendants.       )   9:40 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LaSHONDA A. HUNT

APPEARANCES:

For the Plaintiffs:      HONIGMAN, LLP
                         BY:  MR. ROBERT JOHN PALMERSHEIM
                              MR. TIMOTHY GERRIT PARILLA
                         155 North Wacker Drive
                         Suite 3100
                         Chicago, Illinois  60606
                         (312) 701-9393

For the Defendants:      LATHAM & WATKINS, LLP (IL)
                         MR. GARY FEINERMAN
                         330 North Wabash Avenue
                         Suite 2800
                         Chicago, Illinois  60611
                         (312) 876-7700

Court Reporter:

                    CHARLES R. ZANDI, CSR, RPR, FCRR
                        Official Court Reporter
                     United States District Court
                219 South Dearborn Street, Room 1426
                        Chicago, Illinois  60604
                     Telephone:  (312) 435-5387
                email:  Charles_zandi@ilnd.uscourts.gov

1   APPEARANCES:   (Continued)

2   For the Defendants:        LATHAM & WATKINS, LLP (SF)
                               BY:  MS. ALICIA JOVAIS
3                              505 Montgomery Street
                               Suite 2000
4                              San Francisco, California  94111
                               (415) 931-0600
5

6                              LATHAM & WATKINS, LLP (NY)
                               BY:  MR. BEN HARRIS
7                              1271 Avenue of the Americas
                               New York, New York  10020
8                              (212) 906-1200

9

10  Also Present:              MR. RICK MATTHEWS, General Counsel,
                               CenterPoint Properties Trust.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  to suggest, that this really is about the order that was

2  entered by the state court granting the TRO.

3          But I also think that the factual scenario that has

4  been presented does not fall very neatly into the

5  *Rooker-Feldman* or the *Colorado River* analysis.  Some aspects

6  of it seem to apply.  Other aspects, I'm not so sure.

7          And the parties have gone back and forth on what on

8  Earth is an interested party and -- under -- for purposes of

9  Illinois law.  I've read all of that.  If there's anything

10 additional that you think you should tell me about, you can;

11 but I will just tell you, I'm not quite sure that that is --

12 I think there are enough questions in my mind on those two

13 points that I'm not sure that I would hang my hat on that, if

14 that's a good way to put it, because I think the Seventh

15 Circuit has been very clear and the Supreme Court, all

16 precedent, that I -- that those doctrines should apply when

17 it is clear.

18         And here, I'm not so sure that it's crystal clear,

19 but I'll give you your chance.  If there's something more that

20 you want to tell me about that, you can.  And so I just put

21 that -- put that out there.

22         So, before we turn to the merits of what's going on

23 here, there are a couple of preliminary questions that I have

24 that would just be helpful for me to have some context.  So,

25 first of all, what is going on in the state court proceedings?

1  you're right, I think you're right, they're not -- they're not

2  an actual party, whether you call them an interested party,

3  they're not a plaintiff or they're not a defendant, maybe

4  that's the way to put it, even though I saw a docket sheet

5  that seemed to reflect that the -- your clients are

6  denominated as a defendant.

7         But does that really -- you know, to the extent that

8  there is discovery that is ongoing about issues in this

9  case -- I mean, and I think actually, the crux of the issue

10  here -- I understand all the antitrust claims, but really,

11  this is about the MOU and how it's being interpreted.  So, is

12  that actually the relevant discovery that would be sought in

13  this case in connection with your motion for a preliminary

14  injunction?

15         MR. PALMERSHEIM:  Not everything, your Honor.  And

16  to respond to your question about are we the real party in

17  interest in the state court action, my answer is far from it.

18  It's a breach of contract action between HRE and the City;

19  and as we've pointed out in our briefs, as a non-party to

20  that contract, we wouldn't even have standing to challenge

21  the validity of that contract based on the claims that are

22  asserted in that case.  That's why we're bringing our claims

23  here because this Court has exclusive federal jurisdiction

24  over the claims that can invalidate that contract.

25         THE COURT:  Okay.  All right.  Thank you.  Was there

1  what is the injury that is at issue here and when did it

2  occur, I don't understand how the plaintiffs could have been

3  injured in December 2016 just by virtue of the MOU being

4  entered into.

5          I mean, I'm assuming that was a public proceeding, a

6  public document because it was entered into by the City of

7  Joliet, the County, the Illinois Department of Transportation.

8  And so, you know, it was known that this was in place.

9          And, in fact, the plaintiffs entered into their own

10 agreement with the City, their own subsequent agreement.  I

11 believe that was in 2021.  And there was, you know, no concern

12 about injury at that point.

13         It seems like the only time there was a question

14 about an injury is when the state court entered a TRO.  I

15 mean, there was even a whole proceeding where the state court

16 dismissed the complaint and then the Illinois Appellate Court

17 reversed.

18         So, there wasn't really an argument that, well, the

19 plaintiff is injured by virtue of the MOU.  It sounds like

20 it's because the state court said that the MOU can't be

21 enforced in the way that the City of Joliet and the plaintiffs

22 were trying to enforce it in the annexation agreement.

23         And so why isn't that the injury that the Court

24 should focus on here?

25         MR. PARILLA:  Your Honor, for a number of reasons,

1  I believe.  One is there was a dispute as to the effect of

2  the MOU, which is still being disputed in the Will County

3  court.  Obviously, the City of Joliet disagrees with the

4  defendants or HRE's interpretation of the MOU.

5      The *Rooker-Feldman* doctrine talks about that a claim

6  is not subject to *Rooker-Feldman* even if -- as long as the

7  federal plaintiff presents an independent claim, even one that

8  denies the state court's legal conclusion; i.e., here, that

9  the MOU, even if enforceable, would be anticompetitive and

10  violative of the Sherman Act.

11      Likewise --

12      THE COURT:  Right.  But I think that when -- at least

13  the way that I read the *Gilbank* case and -- decision, and I

14  will say, it is not a model of clarity just trying to sort

15  through what on Earth is the court saying, but it seems that

16  there was some consistency, at least, or some agreement that

17  the prior interpretation of this question about, well, whether

18  the state court judgment has caused the alleged injury that is

19  now underlying the federal claim, that was still consistent.

20  And the question about whether it was independent looked at,

21  at least from my reading, whether there was this prior injury

22  that the state court failed to remedy.

23      But really, it sounds like here, this injury that

24  you're talking about right now is caused by the fact that the

25  state court entered the TRO because prior to that time, it

1  really have to quote it for the Court again.

2  MR. PALMERSHEIM:  Again, this was -- we cited 229.

3  If the Court will indulge me, it's just a quick quote here.  I

4  think it crystallizes everything.

5  They say, "As a result, A, the private party is

6  immune for requesting an anticompetitive statute or government

7  order later found not to have *Parker* immunity; but B, the

8  private party may not be immune for its actions subsequently

9  undertaken under this non-immune statutory regime,

10  particularly for its unsupervised anticompetitive conduct,"

11  so, the analysis of the private party's actions after the

12  petitioning takes place under the regime of *Parker* or whatever

13  other immunity doctrine may be at play.

14  I just want to touch briefly on the argument from

15  opposing counsel on the fraudulent misrepresentation to the

16  Joliet court.  I mean, I think at the end of the day, we've

17  got a fact issue.  The case law is -- at a minimum.  The case

18  law is pretty clear that *Noerr* is an affirmative defense.  The

19  allegations should be taken as true, and if there's -- even if

20  there's serious doubt, the Court should deny the motion to

21  dismiss.

22  We've alleged in our complaint that they made a

23  misrepresentation to the Joliet court about the impact on the

24  tolls that lifting these weight restrictions would have.

25  We've highlighted for the Court in our brief that they made an

1  argument as follows:  "Nor can the contract be rewritten to

2  require HRE to engage in permit litigation to pursue the City

3  for daily losses resulting from a new toll-free access at

4  Millsdale Road."

5        In the appellate proceedings, they made a similar

6  misrepresentation to the court.  And how do we know it's a

7  misrepresentation?  Because as we alleged in the complaint, by

8  virtue of the shenanigans that are going on here, the toll

9  revenue will actually increase because more trucks will be

10  directed across the bridge, which is contrary to the

11  representations that were made to the tribunals.

12        But what's more, your Honor, in our preliminary

13  injunction papers, we have put in a declaration from an

14  esteemed traffic study expert who conducted a full-on traffic

15  study and demonstrates that contrary to the representations

16  that were made to the court, the toll revenue is going to

17  go up.

18        If I may, your Honor.

19        THE COURT:  Sure.

20        MR. PALMERSHEIM:  Unless the Court has questions,

21  I've got nothing further, save for maybe a rebuttal.

22        THE COURT:  Okay.  Thank you.

23        MS. JOVAIS:  I will try to make this brief, your

24  Honor.  A couple of points I want to address that opposing

25  counsel raised.

1      THE CLERK:  This Court is adjourned.

2    (Which were all the proceedings heard.)

3                    CERTIFICATE

4    I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7  */s/Charles R. Zandi*            *September 4, 2024*

8  Charles R. Zandi               Date
   Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25